**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE LENS.COM LITIGATION          MDL Docket No. _____

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
TRANSFER OF ACTIONS TO THE DISTRICT OF NEVADA PURSUANT TO 28 U.S.C.
§ 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure for the United States

Judicial Panel on Multidistrict Litigation, Defendant Lens.com, Inc. ("Lens.com") respectfully

submits this memorandum of law in support of its motion for transfer and coordination for pretrial

purposes.

## INTRODUCTION

In 2024, five class action lawsuits were filed against Lens.com. These cases, each arising

from the same or similar allegations, were filed in Nevada, California, Illinois, Florida, and

Massachusetts: 1) *Franks v. Lens.com Inc.* in the District of Nevada ("*Franks*"); 2) *Nail v.

Lens.com, Inc.*, in the Central District of California ("*Nail*"); 3) *Fitzpatrick v. Lens.com, Inc.*, in

the Northern District of Illinois ("*Fitzpatrick*"); 4) *Martin v. Lens.com, Inc.*, in the Southern

District of Florida ("*Martin*"); and 5) *Gonneville v. Lens.com, Inc.*, in the District of Massachusetts

("*Gonneville*"). All five of these lawsuits were filed within a few weeks of each other.[1]

Each of these cases allege that Lens.com adds a processing fee to its orders during the

checkout process that increases the total cost of their orders beyond the advertised price of a

particular box of contact lenses. These cases further allege that Lens.com's processing fees violate

various consumer protection statutes and other state laws.

---

[1] As reflected in the Proof of Service filed contemporaneously herewith, the plaintiffs in *Martin, Nail,* and *Fitzpatrick* are represented by the same or otherwise overlapping counsel.

Lens.com moved to transfer the cases filed in California, Illinois, Florida, and Massachusetts to the District of Nevada pursuant to the forum-selection clause found in the Terms of Use on Lens.com's website. The courts in California (*Nail*) and Illinois (*Fitzpatrick)* granted Lens.com's motions to transfer.  These cases have now been transferred to the District of Nevada and assigned to the United States District Judge Jennifer A. Dorsey, who is presiding over *Franks*, the case originally filed in Nevada.

On November 19, 2024, the United States District Judge David Leibowitz, presiding over the *Martin* case in the Southern District of Florida, issued an order which granted in part Lens.com's motion to transfer. This order transferred Martin's breach of contract claim and his unjust enrichment claim to the District of Nevada, but retained Martin's statutory consumer protection claim in Florida. The final of the five class action lawsuits, *Gonneville*, is presently pending in the District of Massachusetts. As of the filing date of this motion, the motion to transfer filed by Lens.com in the *Gonneville* case has not been resolved.

Given that the majority of these related cases have already been transferred to Nevada before a single court, Lens.com seeks, pursuant to 28 U.S.C. § 1407, to transfer the non-transferred claim in *Martin* and the claims in *Gonneville* to the District of Nevada to allow for consolidation or coordination with the above-described class actions currently pending in Nevada. Transfer and coordination are appropriate because these actions involve nearly identical factual allegations, shared legal questions, and overlapping classes. For example, all five cases make nearly identical factual allegations concerning Lens.com's fees.  Both *Franks* and *Gonneville* propose nationwide classes, while *Nail*, *Martin*, and *Fitzpatrick* seek to represent classes of consumers in California, Florida, and Illinois, respectively.

2

Consolidation in the District of Nevada will eliminate duplicative discovery, prevent conflicting rulings, and reduce unnecessary litigation costs, benefiting all parties and conserving judicial resources. The District of Nevada is the most suitable jurisdiction for the coordinated proceedings because three of these cases are already in Nevada and a portion of one of the two remaining cases is also in Nevada. In addition, Lens.com is headquartered in Nevada and most of Lens.com's evidence and witnesses are located in Nevada. Additionally, Judge Dorsey is currently presiding over three of these cases and is uniquely positioned to preside over the consolidated proceedings, as she is already handling related actions involving the same facts and will become familiar with the alleged common issues in these cases.

## BACKGROUND

Lens.com is an online retailer of contact lenses headquartered in Nevada. It sells contact lenses to consumers nationwide through its website (www.lens.com). While five lawsuits were originally filed, a severance in *Martin* has resulted in six putative class action lawsuits currently pending against Lens.com (hereinafter the "Related Class Actions"):

1. *Franks v. Lens.com, Inc.*, Case No. 2:24-cv-0724-JAD-NJK (D. Nev.) ("*Franks*");

2. *Nail v. Lens.com, Inc.*, Case No. 2:24-cv-01149-JAD-EJY (D. Nev.) ("*Nail*");

3. *Mary Agrella Fitzpatrick v. Lens.com, Inc.*, Case No. 2:24-cv-02203-JAD-EJY (D. Nev.) ("*Fitzpatrick*");

4. *Martin v. Lens.com, Inc.*, Case No. 0:24-cv-60489-DSL (S.D. Fla.) ("*Florida Martin*");

5. *Martin v. Lens.com, Inc.*, Case No. 2:24-cv-2160-RFB-BNW (D. Nev.) ("*Nevada Martin*"); and

6. *Gonneville v. Lens.com, Inc.*, Case No. 1:24-cv-11110-PBS (D. Mass.) ("*Gonneville*").

The plaintiffs in the Related Class Actions are individuals proposing to represent classes of similarly situated persons, all of whom allege harm caused by Lens.com. Specifically, the plaintiffs allege that Lens.com adds a processing fee to orders during the checkout process that increases the total cost of orders beyond the advertised price of a particular box of contact lenses in a manner that misled consumers. All plaintiffs allege they suffered harm as a result of the added processing fee. The Related Class Actions allege shared common questions of fact and law, involve overlapping classes of plaintiffs, overlapping plaintiffs' counsel, and remain in the early stages of litigation.[2]

## I.   The Related Class Actions

### A.  *Franks*

On April 12, 2024, Plaintiff Oren Franks filed a class action lawsuit in the District of Nevada. A copy of Franks's First Amended Complaint is attached as Exhibit A. In his complaint, Franks alleges that Lens.com imposes a "substantial additional charge labeled as a 'fee' or 'processing fee,'" which allegedly results in a final price significantly higher than its advertised prices. Ex. A, ¶ 14.

Franks asserts a claim under his state's consumer protection statute, the Nevada Deceptive Trade Practices Act ("NDTPA"). He alleges that Lens.com's actions constitute "false or misleading statements of fact concerning the price of goods or services" in violation of the NDTPA. *Id.*, ¶ 51. Franks seeks to represent the following proposed nationwide class: "All persons in the United States overcharged by Lens.com for undisclosed or improperly disclosed fees or

---

[2] For the avoidance of doubt, Lens.com does not concede that the overlapping nature of the factual allegations makes class treatment appropriate in any of the putative class actions.

other deceptive price increases through orders on its website." *Id.*, ¶ 47. *Franks* remains in the early stages of litigation, with discovery just beginning.

### B. *Nail*

Plaintiff Adam Nail filed a similar class action against Lens.com in California, which was transferred to the District of Nevada on June 21, 2024. A copy of Nail's First Amended Complaint is attached as Exhibit B. A copy of the Order transferring *Nail* to the District of Nevada is attached hereto as Exhibit B-1.  In his complaint, Nail alleges that Lens.com advertises deceptively low prices and then charges consumers hidden fees, resulting in a higher final price. Ex. B, ¶¶ 1–4.

Nail likewise brings claims under his state's consumer protection statutes, the California Consumers Legal Remedies Act (CLRA) and the California Business and Professions Code (CBPC). Ex. B, ¶¶ 41–67. Nail seeks to represent the following class of consumers, which overlaps with the proposed nationwide class in *Franks*:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased products from Defendants and were assessed a higher price than represented in advertisements and on Defendants' website.[3]

*Id.* ¶ 32. *Nail* remains in the early stages of litigation. While a motion to dismiss has been resolved, discovery has not yet commenced.

### C. *Fitzpatrick*

Plaintiff Mary Fitzpatrick filed a class action in Illinois, which was transferred to the District of Nevada on November 20, 2024. A copy of Fitzpatrick's Amended Class Action

---

[3] Nail stated in his opposition to Lens.com's motion to dismiss that his proposed class is limited to California consumers. However, despite having the opportunity to clarify this limitation, the language used in Nail's Amended Complaint does not reflect it. *See Opp. to Amended Motion to Dismiss*, Case No. 2:24-cv-01149, ECF No. 47 at 5. As written, the plain language of the Amended Complaint suggests a nationwide class.

Complaint is attached as Exhibit C. A copy of the Order transferring *Fitzpatrick* to the District of Nevada is attached hereto as Exhibit C-1. Fitzpatrick makes similar factual allegations, claiming that Lens.com advertises artificially low prices and charges hidden added fees. Ex. C, ¶¶ 1–4. As with the other plaintiffs, Fitzpatrick asserts a claim under her state's consumer protection statute, the Illinois Consumer Fraud and Deceptive Practices Act ("ICFDPA"). *Id.*, ¶¶ 45–55. Fitzpatrick proposes an Illinois state class which overlaps Franks's proposed nationwide class. *Id.*, ¶ 38. *Fitzpatrick* is in the early stages of litigation. A motion to dismiss certain claims in *Fitzpatrick* is pending, and discovery has not yet begun.

### D.  *Florida Martin*

Plaintiff Rickey Martin filed a similar class action in the Southern District of Florida. A copy of Martin's Complaint is attached as Exhibit D. In his complaint, Martin brings a claim under his state's consumer protection statute, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Ex. D, ¶¶ 34–42. Martin's FDUTPA allegations include charging "Taxes & Fees" that were not due, misrepresenting "Taxes & Fees" as a processing fee, and imposing excessive processing fees. *Id.*, ¶ 40. Additionally, Martin asserts claims of breach of contract and unjust enrichment. *Id.*, ¶¶ 43–55.

On November 19, 2024, the *Martin* court transferred plaintiff's breach of contract and unjust enrichment claims to the District of Nevada, but retained the FDUTPA claim in Florida. A copy of the *Martin* Order is attached hereto as Exhibit D-1.

Martin's proposed class overlaps with *Franks's* and *Gonneville's* proposed nationwide classes. Specifically, Martin seeks to represent "[a]ll Florida residents and consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class

certification, purchased products from Defendant and paid a charge labeled 'Taxes & Fees.'" *Id.*, ¶ 26. *Florida Martin* is also in the early stages of litigation, with discovery just beginning.

### E.  *Nevada Martin*

As noted above, on November 19, 2024, Judge Leibowitz transferred the breach of contract and unjust enrichment claims from *Martin v. Lens.com, Inc.*, Case No. 0:24-cv-60489-DSL (S.D. Fla.) to the District of Nevada. In these claims, Martin alleges that Lens.com charged "Taxes & Fees" that were not due, misrepresented "Taxes & Fees" as a processing fee, and imposed excessive processing fees. Ex. D, ¶¶ 43–49. Martin further asserts that Lens.com unlawfully retained a benefit because of the deceptive, unfair, and misleading nature of the fees. *Id.*, ¶¶ 50–55. As previously mentioned, Martin proposes a class of Florida consumers. *Nevada Martin* is also in the early stages of litigation.

### F.  *Gonneville*

Plaintiff Angela Gonneville filed a class action in Massachusetts. A copy of Gonneville's Complaint is attached as Exhibit E. Lens.com filed a motion to transfer *Gonneville* to the District of Nevada, which is fully briefed.[4] However, as of the filling of this motion, the case remains pending in the District of Massachusetts.

Gonneville similarly asserts claims under her state's consumer protection statute, the Massachusetts Regulation of Business Practices for Consumers Protection Act, as well as claims for breach of contract, unjust enrichment, and breach of the duty of good faith and fair dealing, similar to those in *Martin*. Ex. E, ¶¶ 36–66.

---

[4] *Gonneville* was initially transferred from Massachusetts to the District of Nevada due to a clerical error. Subsequently, the District Court for the District of Massachusetts vacated its transfer order, and the case returned to Massachusetts. Oral argument was held on Lens.com's Motion to Transfer on July 16, 2024, which remains under consideration.

Consistent with the other class actions, Gonneville alleges that Lens.com imposes hidden processing fees, resulting in inflated prices. *Id.*, ¶¶ 13–19. Gonneville proposes a nationwide class that overlaps with the proposed classes in all the Related Class Actions. *Id.*, ¶ 24. Alternatively, Gonneville seeks to certify a class of Massachusetts consumers, which also overlaps the nationwide class proposed in *Franks. Id.*, ¶ 25. Like the other Related Class Actions, *Gonneville* is in the early stages of litigation, with both a motion to transfer and a motion to dismiss pending. Discovery has not yet commenced.

## II.    Consolidation

On November 25, 2024, Lens.com filed a motion to consolidate the cases and claims presently pending in Nevada. A hearing on that motion to consolidate is set for February 11, 2025. In its motion to consolidate, Lens.com has asked that the claims presently pending in Nevada be consolidated in front of Judge Dorsey for all purposes. As noted above, Judge Dorsey is the judge currently assigned to the *Nail, Franks, Fitzpatrick* cases.

## III.    Common Class Action Allegations

The Related Class Actions are alleged to share overlapping factual and legal issues that directly pertain to the propriety of class certification. These issues align with the key elements required under Rule 23 of the Federal Rules of Civil Procedure: numerosity, commonality, typicality, adequacy of representation, and superiority.

**Numerosity.** Each action asserts that the proposed class is sufficiently numerous to satisfy Rule 23(a)(1). The plaintiffs claim that the number of individuals affected by Lens.com's alleged deceptive practices makes joinder impracticable. Ex. A, ¶ 49(a); Ex. B, ¶ 35; Ex. C, ¶ 40; Ex. D, ¶ 29; Ex. E, ¶ 29.

8

**Commonality.** The plaintiffs allege that "there are questions of law or fact common to" the proposed classes. Ex. A, ¶ 49(b); Ex. B, ¶ 36; Ex. C, ¶ 41; Ex. D, ¶ 30; Ex. E, ¶ 30. Examples of these alleged common questions include:

1. Whether Defendant deceptively represented the price of contact lenses. Ex. A, ¶ 49(b)(i); Ex. B, ¶ 36(a); Ex. C, ¶ 41(a); Ex. D, ¶ 30(a); Ex. E, ¶ 30(b).

2. Whether the "Taxes & fees" charge is "deceptive and unfair." Ex. B, ¶ 36(d)−(f); Ex. C, ¶ 41(b)−(d); Ex. D, ¶ 30(c)−(e).

3. Whether Defendant was unjustly enriched by charging a fee. Ex. A, ¶ 49(b)(iii); Ex. B, ¶ 36(j); Ex. D, ¶ 30(i).

4. Whether plaintiffs and class members were harmed by Defendant's unfair, unlawful, deceptive, and misleading conduct. Ex. A, ¶ 49(b)(iv); Ex. B, ¶ 36(k); Ex. C, ¶ 41(g); Ex. D, ¶ 30(j); Ex. E, ¶ 30(e)−(f).

**Typicality.** The plaintiffs contend that their claims are typical of those of the proposed class members, as all were allegedly harmed by Lens.com's allegedly "deceptive advertisements." Ex. A, ¶ 49(c); Ex. B, ¶ 37; Ex. C, ¶ 42; Ex. D, ¶ 31; Ex. E, ¶ 31.

**Adequacy of representation.** The plaintiffs assert that they will fairly and adequately protect the interests of the proposed class. Ex. A, ¶ 49(d); Ex. B, ¶ 38; Ex. C, ¶ 43; Ex. D, ¶ 32; Ex. E, ¶ 32.

**Superiority.** The plaintiffs argue that a class action is the superior method for resolving these disputes. Ex. A, ¶ 49(g); Ex. B, ¶ 40; Ex. C, ¶ 44; Ex. D, ¶ 33, Ex. E, ¶ 34.

## IV.   The Propriety of the District of Nevada

Most of the Related Class Actions are already pending in the District of Nevada, including *Franks*, *Nail*, *Fitzpatrick* and *Nevada Martin* (the "Nevada Actions"). Only *Florida Martin* and

*Gonneville* (the "Non-Transferred Actions") remain in other districts.

As Lens.com is headquartered in Nevada, it is expected that most of the relevant evidence and witnesses will be located there. Furthermore, Judge Dorsey has adjudicated motions to dismiss in *Franks* and *Nail*, gaining familiarity with the common issues underlying all the Related Class Actions.

## ARGUMENT

### I. Transfer of *Gonneville* and *Florida Martin* for Coordination With the Nevada Actions for Pretrial Proceedings Is Appropriate.

Transfer for coordinated or consolidated pretrial proceedings is appropriate under 28 U.S.C. § 1407(a) when civil actions pending in different districts involve "one or more common questions of fact." The Judicial Panel on Multidistrict Litigation must also determine that such a transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." *Id.* The purpose of transfer is to "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.131 (2004).

Here, the Related Class Actions are alleged to involve one or more common questions of fact because they assert nearly identical factual allegations—namely, that Lens.com adds a deceptive processing fee to orders that allegedly results in a total order price being higher than its advertised prices. Moreover, transfer will be convenient for the parties and witnesses because it will avoid duplicative discovery practice, particularly since the actions are in early stages of litigation. Transfer will also promote the just and efficient conduct of these actions by unifying pretrial proceedings, thereby eliminating the risk of conflicting rulings on critical issues such as class certification and dispositive motions.

The District of Nevada is the most appropriate forum for coordination. Lens.com is headquartered in Nevada, and the majority of the relevant evidence and witnesses are located there. *Franks' First Amended Complaint*, Ex. A ¶ 7; *Supplemental Declaration of Tim Jaeck*, Ex. D-2, ¶¶ 5–6.[5] Furthermore, most of the actions are currently pending in the District of Nevada before Judge Dorsey. Given her familiarity with these cases, transferring *Gonneville* and *Florida Martin* to the District of Nevada for coordinated pretrial proceedings with the Nevada Actions before Judge Dorsey will serve the interests of justice and efficiency.

### A.  The Related Actions Involve Common Questions of Fact.

Transfer of the Non-Transferred Actions is appropriate because they involve alleged common questions of fact shared with all the Related Class Actions—namely, the allegation that Lens.com engages in deceptive pricing by imposing a processing fee to its orders. Ex. D, ¶ 40; Ex. E, ¶¶ 13–19. While there are minor variations in the legal causes of action, "[t]ransfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007). Instead, transfer is appropriate when "actions share 'one or more' common issues of fact." *In re Angiodynamics, Inc.*, 2024 U.S. Dist. LEXIS 182258, at *3 (J.P.M.L. Oct. 3, 2024) (citing *id.*).

*In re Capital One 360 Sav. Acct. Int. Fee Litig.* is instructive. In that case, the Panel determined that transfer was appropriate when all plaintiffs made similar factual allegations against a single defendant. 2024 U.S. Dist. LEXIS 102143, at *1–3 (J.P.M.L. June 7, 2024). The Panel further held that common questions of fact exist among related actions when plaintiffs assert

---

[5] This *Supplemental Declaration of Tim Jaeck* was originally filed in the Southern District of Florida with Lens.com's supplemental briefing in support its Motion to Change Venue. Case No. 0:24-cv-60489-DSL, ECF No. 35-1.

similar causes of action. Specifically, the Panel noted, "All actions are putative nationwide or statewide class actions . . . and all plaintiffs assert similar claims for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and violation of state consumer protection laws." *Id*, at *2. Under these circumstances, the Panel concluded that transfer was warranted.

Here, as in *In re Capital One*, plaintiffs in the Related Class Actions make similar factual allegations against the sole defendant, Lens.com. Specifically, they assert that Lens.com imposes a "misleading added fee'" which allegedly results in a final price significantly higher than its advertised prices. Ex. D, ¶ 11; *see also*, Ex. E, ¶ 15; Ex. A, ¶ 14; Ex. B, ¶ 2; Ex. C, ¶ 2. Additionally, the plaintiffs also unanimously allege that "there are questions of law or fact common to" the proposed classes. Ex. A, ¶ 49; Ex. B, ¶ 36; Ex. C, ¶ 41; Ex. D, ¶ 30; and Ex. E, ¶ 30. These common questions include:

1.  Whether the "Taxes & fees" charge is "deceptive and unfair."

2.  Whether Defendant was unjustly enriched by charging a fee.

3.  Whether plaintiffs and class members were harmed by Defendant's unfair, unlawful, deceptive, and misleading conduct.

*See supra* at 8–9.

The plaintiffs also allege similar causes of action and claim to be similarly situated individuals. For example, all plaintiffs allege "violation of state consumer protection laws." They all purport to represent individuals who "purchased products from Defendant" and were charged a "processing fee" that resulted in a higher final price. While their proposed classes definitions differ, the classes overlap. For example, plaintiff Martin's proposed class of Florida consumers is subsumed within Frank's and Gonneville's proposed classes of nationwide consumers. Thus, both

Martin, Franks, and Gonneville advance the same factual allegations on behalf of overlapping groups of consumers.

Because the plaintiffs in the Related Class Actions raise common factual allegations, assert similar causes of action under state consumer protection laws, and purport to represent similarly situated groups of consumers, transfer of the Non-Transferred Actions is appropriate.

### B.   Transfer Will Serve the Convenience of the Parties and Witnesses and Will Promote Just and Efficient Conduct of This Litigation.

Coordination of all the Related Class Actions for pretrial proceedings will serve the convenience of the parties and witnesses while promoting the just and efficient conduct of this litigation. Transfer will eliminate the risk of conflicting rulings and duplicative discovery, conserving the resources of the parties, witnesses, and the judiciary.

### i.   Transfer will eliminate the risk of conflicting rulings.

The alleged common questions of fact across the Related Class Actions make the existence of similar pretrial issues inevitable. Overlapping proposed classes increases the risk of inconsistent legal obligations for the same plaintiffs. To "eliminate any possibility of conflicting class[es] and other pretrial rulings," transfer of each action "is necessary." *In re "Fine Paper" Antitrust Litig.*, 453 F. Supp. 118, 121 (J.P.M.L. 1978).

The reasoning in *In re Republic Nat'l-Realty Equities Sec. Litig.* underscores this necessity. There, the Panel emphasized that having a single judge make determinations on class action questions would be most effective, particularly in cases involving overlapping proposed classes. 382 F. Supp. 1403 (J.P.M.L. 1974). The Panel held that when a class of plaintiffs falls "within the boundaries" of classes in other actions "***it is necessary to have all class action questions resolved by a single judge*** in order to eliminate the possibility of conflicting class determinations and

achieve the most expeditious method of organizing the class or classes and any necessary subclasses." *Id.* at 1406 (emphasis added).

Similarly, in the present matter, the proposed classes in the Related Class Actions "fall within the boundaries" of one another. Centralizing class action determinations before a single judge will ensure consistency in certification of the class or classes and eliminate the risk of conflicting rulings or duplicative adjudications. Indeed, because the classes in the Non-Transferred Actions overlap with the Nevada Actions, potential conflicts, inconsistent rulings, and risks of double recovery are unavoidable without transfer. Informal coordination cannot resolve these issues. Counsel can attempt to coordinate discovery and pre-trial motions, but the differing courts will not be able to. As one example, if a pretrial dispositive motion is resolved in Lens.com's favor in *Franks*, plaintiffs in *Florida Martin* would essentially get a second bite at the apple. They would be able to relitigate similar dispositive issues despite presenting substantially identical claims under identical facts. Moreover, if plaintiffs in *Franks* prevail, the *Florida Martin* plaintiffs would recover twice for the same alleged wrongful conduct, thereby unjustly penalizing Lens.com. This would not promote the just conduct of the litigation. Of course, this is just one example. Without transfer, the potential for myriad unjust or inconsistent outcomes persists across the Related Class Actions.

These challenges make transfer and coordination unavoidable. No feasible alternative exists to achieve uniformity in rulings and avoid duplicative litigation. Conducting pretrial proceedings before one judge in a single district is the optimal method for "organizing the class or classes and any necessary subclasses" and ensuring congruency of legal obligations across the Related Actions. *In re Republic Nat'l-Realty Equities Sec. Litig.*, 382 F. Supp. at 1406.

## ii.   Transfer will eliminate the risk duplicative discovery.

There will be significant overlap in discovery across the cases. The documents, company witnesses, and expert witnesses will largely overlap.  As such, coordinating the Related Class Actions will eliminate duplicative efforts. *In re Future Motion, Inc. Prods. Liab. Litig.*, 709 F. Supp. 3d 1394, 1396 (J.P.M.L. 2023) ("With respect to the actions in which discovery remains, centralization will allow for coordination and elimination of duplicative discovery and motion practice."). Additionally, the fact that all the Related Actions remain in the early stages of litigation further reduces the risk of duplicative discovery with transfer and consolidation.

In *In re Baby Food Mktg.*, the Panel held that when it is probable that there will be overlap in discovery, centralization will eliminate duplicative discovery. 730 F. Supp. 3d 1371 (J.P.M.L. 2024). The Panel found that overlap in discovery was probable when the related cases shared common questions of fact. *Id.* at 1372–73 ("There likely will be overlap in the discovery as to the defendants. . . . Common expert discovery, as to both plaintiffs and defendants, also is probable. Centralization will facilitate a uniform and efficient pretrial approach to this litigation, eliminate duplicative discovery, prevent inconsistent rulings on expert testimony and other pretrial issues, and conserve the resources of the parties, their counsel, and the judiciary.").

Similarly, the numerous common questions of fact across the Related Class Actions make overlapping discovery inevitable, particularly concerning Lens.com. All plaintiffs allege nearly identical facts, which likely will lead to similar interrogatories, discovery requests, and deposition questions related to Lens.com. Lens.com's witnesses and experts will likewise largely overlap. Centralization and coordination will "facilitate a uniform and efficient pretrial approach to this litigation" and "eliminate duplicative discovery." *Id.* at 1373.

Furthermore, because the Related Actions are still in the early stages of litigation and discovery has not yet begun (or is just beginning), coordination at this stage is ideal.

### iii. Transfer will conserve the resources of the parties, witnesses, and judiciary.

Transfer and consolidation will conserve the resources of the parties, witnesses, and judiciary for the same reasons outlined above. Avoiding duplicative discovery, motion practice, and other pretrial proceedings will ensure that resources are used effectively. Without centralization, the parties and witnesses would face multiple depositions and repetitive discovery requests on largely identical topics. Similarly, duplicative motions on discovery disputes, dispositive motions, and class certification issues would unnecessarily consume judicial resources. Conflicting rulings, if they arise, would further burden the judiciary with the need to resolve inconsistent legal obligations.

As noted above, all the Related Actions are in the early stages of litigation. Coordinating these actions now will maximize pretrial efficiency, eliminate redundancy, and conserve the resources of all those involved.

## II. The District of Nevada Is the Proper Transferee District, and the Honorable Jennifer A. Dorsey Should Preside.

The District of Nevada is the appropriate forum for transfer and coordination of the Related Actions for pretrial proceedings.

When considering which district to transfer related matters, the Panel has considered factors such as where the actions are pending, where the relevant evidence and witnesses may be found, and where motions may be pending. For example, in *In re Capital One*, the Panel held that the Eastern District of Virginia was the appropriate transferee district because two actions were "pending there, including the first-filed" action. 2024 U.S. Dist. LEXIS 102143, at *2–3. The Panel also explained that "a fully-briefed motion to dismiss" was pending in that district. *Id.* at *3.

16

Further, the defendant was "headquartered in McLean, Virginia, within the district," and "much of the relevant evidence and many of the relevant witnesses will be found there." *Id.*

Here, the District of Nevada is the proper transferee district for several reasons. First, the Nevada Actions—which comprise the majority of the cases—are already pending there, including *Franks*, which was the first-filed action in the proper forum. Second, while a motion to dismiss is pending in *Nevada Martin*, Judge Dorsey has already ruled on motions to dismiss in *Franks* and *Nail*. Her familiarity with the issues permeating the Related Class Actions makes her best situated to preside over all of these cases. Lastly, Lens.com is headquartered in the District of Nevada, making it highly likely that much of the relevant evidence and many of the witnesses are located there.

## CONCLUSION

For the foregoing reasons, Lens.com respectfully requests that the Panel order the transfer *Gonneville* and *Florida Martin* to the District of Nevada for consolidated or coordinated pretrial proceedings with the Nevada Actions under 28 U.S.C. § 1407 before United States District Judge Jennifer A. Dorsey.

Date: February 7, 2025

Respectfully submitted,

By: *_/s/ James W. Lee_____*
James W. Lee
Laselve E. Harrison
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
jwlee@bsfllp.com
lharrison@bsfllp.com

Mark Bettilyon
Jed H. Hansen
Joseph M. Harmer
THORPE NORTH & WESTERN, LLP
The Walker Center
175 S. Main Street, Suite 900
Salt Lake City, Utah 84111
Tel: (801) 566-6633
mark.bettilyon@tnw.com
hansen@tnw.com
joseph.harmer@tnw.com

*Counsel for Defendant Lens.com, Inc.*

# Exhibit A

Craig Friedberg, Esq.
Nevada Bar No. 004606
LAW OFFICES OF CRAIG B. FRIEDBERG, ESQ.
4760 South Pecos Road, Suite 103
Las Vegas, Nevada 89121
Ph: (702) 435-7968
attcbf@cox.net

[Additional Attorneys on Signature Page]

*Attorneys for Plaintiff Oren Franks and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| OREN FRANKS, individually and on behalf all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LENS.COM, INC.,<br><br>Defendant. | Case Number: 2:24-cv-00724-JAD-NJK<br><br>**FIRST AMENDED**<br>**CLASS ACTION COMPLAINT**<br>**AND JURY DEMAND** |

Plaintiff Oren Franks ("Plaintiff") brings this action against Defendant Lens.com, Inc. ("Lens.com" or the "Company") by and through his attorneys, individually and on behalf of all others similarly situated, and alleges with personal knowledge as to his own actions, and upon information and belief as to those of others, as follows:

### Nature of the Case

1.      Lens.com sells corrective contact lenses online, primarily through its website "www.lens.com".

2.      Defendant advertises low prices to consumers, including Plaintiff, to lure customers to its website. There, consumers fill out details about their corrective lens prescriptions, upload copies of prescriptions, provide address and contact information for their doctor so that prescription information can be verified, and enter their personal information including name, shipping address, billing address and credit card number or other payment information; many also create a dedicated,

1 | password protected account with Lens.com during this process.  Throughout this process, Lens.com
2 | displays the advertised low prices on the screen.

3 |     3.    However, late in the checkout process, only after a consumer has been actively
4 | providing this information throughout, Lens.com adds a purported "processing fee" to the order,
5 | which increases the overall price of the purchase well above those advertised rates. Defendant
6 | does everything it can to hide this fee, which is not clearly or obviously disclosed to consumers.
7 | Instead, consumers will likely only notice Defendant's covert price change if they realize the total
8 | amount they were actually charged at the end of the checkout process is higher than the advertised
9 | rates they had been seeing throughout, and many do not spot this discrepancy.

10 |     4.    This deceptive practice has unjustly enriched Defendant by millions of dollars at
11 | consumers' expense through years of hidden fees.

12 |     5.    Plaintiff brings this suit pursuant to the Nevada Deceptive Trade Practices Act, Nev.
13 | Rev. Stat. §598.0903, *et seq*., and common law, on behalf of all persons in the United States
14 | overcharged by Defendant based on Defendant's false, misleading, and deceptive advertising
15 | ("Class Members" or the "Class") seeking, *inter alia*, injunctive relief, actual damages and refunds,
16 | compensatory damages, disgorgement, restitution, liquidated damages, attorneys' fees, and the
17 | costs of this suit.

18 | **Parties**

19 |     6.    Plaintiff Oren Franks is a natural person residing in Nevada.  At all times mentioned
20 | herein, Plaintiff was a customer of Lens.com.

21 |     7.    Defendant Lens.com, Inc. is a Nevada corporation with a mailing address of P.O.
22 | Box 27740, Las Vegas, Nevada 89126.  Lens.com does business throughout the United States,
23 | including in the State of Nevada, sells contact lenses to consumers in the State of Nevada, and ships
24 | its products to consumers in the State of Nevada.

25 | **Jurisdiction and Venue**

26 |     8.    Jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d)(2). The
27 | amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and
28 | the matter is a class action in which one or more members of the proposed class, which upon

information and belief number in the thousands, are citizens of a state different from the Defendant.

9.  This Court has supplemental jurisdiction over the State law claims in this matter pursuant to 28 U.S.C. § 1367(a), as such causes of action are so related to the claims in the action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332 that they form part of the same case or controversy under Article III of the United States Constitution.

10.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, at all relevant times, Lens.com has continuously transacted business in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**Operative Facts**

11.  Approximately 45 million people in the U.S. wear corrective contact lenses.[1] To obtain contact lenses, a consumer must visit an eye care professional such as an optometrist for a contact lens fitting, and obtain a prescription. Once a consumer obtains a prescription, they can purchase contact lenses.

12.  Contact lenses are typically sold by the "box". Each box of contact lenses contains enough contact lenses to last a certain amount of time. For example, daily disposable contact lenses are often sold in boxes of 30 or 90 contact lenses.

13.  After a consumer visits an eye care professional's office for a contact lens fitting and obtains a prescription, the eye care professional will typically offer to sell the consumer a supply of contact lenses (usually a 6-month supply or a year supply). However, consumers may choose other merchants from whom to purchase the contact lenses themselves. Lens.com is one such merchant advertising contact lenses to consumers, as an alternative to an eye care professional.

14.  Lens.com engages in deceptive and unlawful business practices, at the expense of consumers including Plaintiff, by tagging on a substantial additional charge labeled as a "fee" or "processing fee." This "fee" is substantial and typically results in a final price that is significantly higher than Defendant's advertised prices. This is not actually a fee for any service; it is a made-up charge that Defendant adds to increase the price and its profits.

---

[1] https://www.cdc.gov/contactlenses/fast-facts.html

15. Many consumers do not notice that a "processing fee" is being added to their order, particularly as it is not prominently or clearly displayed anywhere during Defendant's checkout process. In this way, Defendant's false advertising increases its sales and profit by deceiving its customers.

16. On or about October 2022, Plaintiff visited Defendant's website, www.lens.com, to purchase prescription contact lenses.

17. Once Plaintiff entered his prescription information and selected the brand of contact lenses that he wanted to purchase, Defendant's website indicated that the "total" price per box for the "Right Eye" would be "$75.24" and the "total" price per box for the "Left Eye" would be "$75.24."



18. Based on this information represented by Lens.com, Plaintiff's purchase price for two boxes of contact lenses would be approximately $150.48.

19. Plaintiff then selected the "Standard" shipping method for the contact lenses, which according to Defendant's website, would cost the Plaintiff an additional "$9.95."



20.     Plaintiff relied on said pricing information on the Defendant's website and decided to purchase the two boxes of contact lenses with "Standard" shipping.  Plaintiff did not purchase any other items through this order.

21.     When it came time for Plaintiff to submit his order, the "Order Total" for Plaintiff's purchase came out to "$222.91."



22.     Based on the pricing information and representations made by Defendant on its website throughout this ordering process, the total purchase price for Plaintiff's transaction (with

shipping costs included) should have only been $160.43, which means Defendant charged Plaintiff an overage of $62.48.

23. There were no other line-item charges listed on Plaintiff's "Order Summary", pictured above, to account for the overage of $62.48.

24. There were likewise no other line-item charges or surcharges listed on Plaintiff's order confirmation to account for the overage of $62.48.



25. Notwithstanding this mysterious overage charge of $62.48, Defendant claims that it is "completely transparent and let[s] you decide what's best for you." on its website.

26. Customers who visit Defendant's website are likely to, and Plaintiff did in fact, submit his order without noticing that the Defendant inflated its prices and charged Plaintiff for more than the prices advertised on its website.

27. Plaintiff still requires contact lenses and continues to purchase contact lenses via

other sellers on the internet. Despite that, Plaintiff cannot currently rely on Lens.com's advertising due to the above-described misleading marketing and pricing practices. If Plaintiff could be assured that Lens.com's representations were no longer misleading and they have ceased the allegedly fraudulent practices, Plaintiff would consider purchasing contact lenses from Lens.com again.

28.    Plaintiff's experience is not unique. Lens.com's Google advertisements for a 90-pack of DAILIES AquaComfort Plus contact lenses, pictured below, prominently advertises the price that Lens.com charges for that box of contacts: $19.69, whereas competitor's prices include $36.95 and $55.49 for the same product.



29.    Lens.com's website lists the same price for the product, as pictured below.[2]

---

[2] https://www.lens.com/contact-lenses/p-tw4ix/1-day-acuvue-moist/90-pack



30. Reasonable consumers would and do understand these statements to mean that it costs $19.69 to purchase this product from Lens.com through its website, as it would from any honest merchant. No reasonable consumer expects that an advertised price hides an arbitrary and fictitious "processing fee" that will substantially increase the price of such a purchase.

31. After a consumer using Lens.com's website selects the items for their purchase and clicks the "Continue" option, they are asked to upload a copy of or manually provide full information for their prescription, as pictured below:[3]



---

[3] *Id.*

32.     The consumer is then directed to another screen and required to provide their prescribing doctor's contact information to Lens.com:[4]



33.     Even after going through all of these steps, the Lens.com website still misrepresents to consumers that they will be paying the advertised price (in this example, $19.69) for their purchase as the process then takes them to a summary of the consumer's "Shopping Cart":[5]

---

[4] *Id.*
[5] *Id.*



34. When the consumer leaves this page, showing the advertised prices, by clicking "Go To Checkout" they are then asked for their shipping information:[6]



[6] *Id.*

35.     Only below this box, and under the "Continue" button that prompts the consumer to advance to the next page where it would not be initially visible on most devices' displays, is there an "Order Summary" that provides the only indication of the actual, higher cost of the purchase:[7]



36.     Even this "Order Summary" still displays the inaccurate advertised price (in this example, $19.69 per box). It adds a significant but unidentified "Taxes & fees" to the total, which far exceed any taxes owed on such a purchase ($94.96 in the above example). This results in the actual Lens.com price for its products being much higher than the price it advertised to consumers.

37.     The only way for a consumer to get any information on this tucked-away line item is if they (i) notice the "Order Summary" portion of the screen under the Continue button that advances past it, (ii) notice the "Taxes and fees" line, (iii) recognize it is higher than warranted by normal taxes and standard industry fees, and (iv) clicks on the faded grey "i" symbol to prompt a popup display.  Even then, that popup box simply states, in its entirety, that "Taxes are tax recovery charges for tax obligations where applicable and the fees are compensation for servicing your order" as pictured below:[8]

---

[7] *Id.*
[8] *Id.*



38.     When the consumer clicks the "Continue" button, often without having seen the Order Summary hiding below it, they are taken to a screen to enter their payment information which only displays the total amount of the purchase, without identifying the supposed taxes and fees that have inflated the price:[9]

39.     Many consumers do not notice the hidden "taxes and fees" line item (or do not notice that the amount shown far exceeds any taxes that could possibly be applicable), and do not notice

---

[9] *Id.*

that the amount being charged for it or the for "Order Total" on the very last page is much higher than what it should be based on Defendant's representations. Such consumers, like Plaintiff, go through with the purchase without realizing that they are being charged a price much higher than the advertised price that induced them to visit Lens.com's website in the first place.

40.     Even if Plaintiff and/or consumers were to discover that they are being charged a price much higher than the advertised price, they would have already been damaged due to the time and effort they have expended attempting to complete the transaction.

41.     Defendant knowingly inflated its costs and unlawfully hid excess charges from customers, including Plaintiff. Upon information and belief, millions of Defendant's customers do not realize that they have been subject to such hidden overcharges.

42.     Defendant's advertisements are falsified and misleading to attract customers, like the Plaintiff, to its website.

43.     Defendant's website contains misrepresentations regarding its prices and feeds customers misleading information in a deceptive manner. The prices listed on Defendant's website deceptively lured Plaintiff to buy his contact lenses from the Defendant.

44.     Defendant's representations are material to the customer's decision-making process and have the capacity to deceive, and actually do deceive, customers, including Plaintiff.

45.     As a result of Defendant's conduct, Plaintiff and others similarly situated, have been damaged.

**Class Action Allegations**

46.     This matter is brought by Plaintiff on behalf of himself and those similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

47.     The Class that Plaintiff seeks to represent is defined as follows:

All persons in the United States overcharged by Lens.com for undisclosed or improperly disclosed fees or other deceptive price increases through orders on its website (the "Class").

48.     Excluded from the Class are Defendant Lens.com; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant

1  otherwise controls or controlled; and any officer, director, employee, legal representative,

2  predecessor, successor, or assignee of Defendant.

3       49.    This action is brought as a class action for the following reasons:

4           a.    The Class consists of thousands of persons or more and is therefore so

5  numerous that joinder of all members, whether otherwise required or

6  permitted, is impracticable;

7           b.    There are questions of law or fact common to the Class that predominate

8  over any questions affecting only individual members, including:

9             i.    Whether Lens.com's sales and billing practices, as alleged herein, are

10  unjust and unreasonable in violation of the law.

11            ii.    Whether Lens.com's website adequately discloses all terms, fees, and

12  conditions of purchases to consumers as required under the law;

13          iii.    whether Lens.com was unjustly enriched by the concealing fees from

14  consumers;

15          iv.    whether Plaintiff and the Class have sustained damages and, if so, the

16  proper measure thereof; and

17           v.    whether Lens.com should be enjoined from the unlawful practices

18  alleged herein;

19           c.    The claims asserted by Plaintiff are typical of the claims of the members of

20  the Class;

21           d.    Plaintiff will fairly and adequately protect the interests of the Class, and

22  Plaintiff has retained attorneys experienced in class and complex litigation, including class

23  litigation involving consumer protection, identity theft, and consumer fraud;

24           e.    Prosecuting separate actions by individual Class Members would create a

25  risk of inconsistent or varying adjudications with respect to individual Class Members that would

26  establish incompatible standards of conduct for Lens.com;

27           f.    Defendant has acted on grounds that apply generally to the Class so that final

28  injunctive relief prohibiting Lens.com from continuing their deceptive, unconscionable practices is

appropriate with respect to the Class as a whole;

        g.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

        i.     Absent a class action, Class Members, as a practical matter, will be unable to obtain redress, Lens.com's unlawful practices will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

        ii.     It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

        iii.     When the liability of Lens.com has been adjudicated, the Court will be able to determine the claims of all members of the Class;

        iv.     A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

        v.     The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

        vi.     Lens.com has acted on grounds generally applicable to Class Members, making class-wide monetary and injunctive relief appropriate.

### FIRST CAUSE OF ACTION
**Violation of Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §598.0903, *et seq*.**
**(On Behalf Of Plaintiff And Class Members)**

50.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

51.    As repeatedly alleged herein, Lens.com has engaged in false, deceptive, or misleading acts, practices and/or omissions in connection with marketing and sales tactics for contact lenses on its website. In all such cases, the alleged acts, practices and omissions were, and are, in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §598.0903, *et seq*.,

1  specifically including but not limited to "false or misleading statements of fact concerning the price

2  of goods or services for sale or lease, or the reasons for, existence of or amounts of price

3  reductions." Nev. Rev. Stat. § 598.0915 (13).

4  52.  Lens.com used or employed an unconscionable commercial practice, deception,

5  fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression,

6  or omission of any material fact with the intent that others rely upon such concealment, suppression

7  or omission, in connection with its efforts to coerce Plaintiff and Class Members to purchase its

8  products, in violation of Nev. Rev. Stat. §598.0903, *et seq*.

9  53.  Defendant's misrepresentations and nondisclosures are material, as a reasonable

10  person would have attached importance to said information and would be induced to act on said

11  information in making purchase decisions.

12  54.  Plaintiff and Class Members reasonably relied on the representations and/or

13  omissions of the Defendant to purchase products from the Defendant.

14  55.  Plaintiff and class members suffered financial harm as a consequence of Defendant's

15  false advertising and misrepresentations.

16  56.  Plaintiff brings this cause of action pursuant to Nev. Rev. Stat. § 41.600, which

17  authorizes a private right of action for "any person who is a victim of consumer fraud", including

18  violations of the Nevada Deceptive Trade Practices Act.

19  **DEMAND FOR TRIAL BY JURY**

20  57.  Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a

21  trial by jury.

22  **PRAYER FOR RELIEF**

23  WHEREFORE, Plaintiff and the putative Class Members pray for the following relief:

24  1.  An order certifying the class defined above, appointing Plaintiff as class

25  representative and appointing his attorneys as class counsel;

26  2.  Equitable and injunctive relief;

27  3.  Restitution;

28  4.  Judgment for damages, including actual, statutory, treble and punitive, where

1    applicable;

2    5.    Pre- and post-judgment interest on the above amount;

3    6.    Attorney's fees and costs of this action; and

4    7.    For such other and further relief as may be just and proper, including but not limited

5    to a preliminary and permanent order enjoining Defendant and its agents,

6    employees, affiliates and/or subsidiaries, from otherwise engaging in the unlawful

7    and unfair acts and practices alleged herein.

8    Dated:  October 8, 2024

9                           LAW OFFICES OF CRAIG B. FRIEDBERG, ESQ.

10

11                    By:  */s/ Craig B. Friedberg*
                            Craig B. Friedberg, Esq.

12                            Matthew R. Mendelsohn

13                            MAZIE SLATER KATZ & FREEMAN, LLC
                            103 Eisenhower Parkway

14                            Roseland, New Jersey 07068
                            Tel: (973) 228-9898

15                            mrm@mazieslater.com

16                            (*Pro Hac Vice*)

17                            Todd S. Garber

18                            FINKELSTEIN, BLANKINSHIP,
                            FREI-PEARSON & GARBER, LLP

19                            One North Broadway, Suite 900
                            White Plains, New York 10601

20                            Tel: (914) 298-3281

21                            tgarber@fbfglaw.com
                            (*Pro Hac Vice*)

22                            Amir J. Goldstein

23                            THE LAW OFFICES OF AMIR J. GOLDSTEIN,
                            ESQ.

24                            7304 Beverly Boulevard, Suite 212
                            Los Angeles, CA 90036

25                            Tel: (323) 937-0400
                            ajg@consumercounselgroup.com

26

27                            *Attorneys for Plaintiff and the Putative Class*

28

# Exhibit B

**LTL ATTORNEYS LLP**
Caleb H. Liang (Admitted *Pro Hac Vice*)
  *caleb.liang@ltlattorneys.com*
300 S Grand Ave, Suite 3950
Los Angeles, CA 90071
Telephone: (213) 612-8900
Facsimile: (213) 612-3773

Allison Schmidt (NV Bar No. 10743)
allison@nevadaslawyers.com
10777 W. Twain Ave., Ste. 300
Las Vegas, NV, 89135
Telephone: (702) 900-9040

Attorneys for Plaintiff Adam Nail

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ADAM NAIL, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>LENS.COM, INC., a Nevada corporation; and Does 1 through 10, inclusive,<br><br>  Defendants. | Case No.: 2:24-cv-01149-JAD-EJY<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1. California Consumers Legal Remedies Act, Civil Code section 1750;<br><br>2. California Business and Professions Code section 17500; and<br><br>3. California Business and Professions Code section 17200.<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Adam Nail ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this consumer Class Action against Defendant Lens.com, Inc. ("Lens.com"), and Does 1 through 10 inclusive (collectively "Defendants"), for unlawful, unfair, and deceptive business practices in violation of: (1) California's Consumer Legal Remedies Act, California Civil Code sections 1750, *et seq.*; (2) California's False Advertising Law, California Business and Professions Code sections 17500, *et seq.*; and (3) California's Unfair Competition Law, California Business and Professions Code sections 17200, *et seq.* Plaintiff, by and through his counsel, complains and alleges upon information and belief based upon, among other things, the investigation made by Plaintiff and through his attorneys, as follows:

## NATURE OF THE CASE

1. This is a proposed consumer class action seeking monetary damages and injunctive relief from Defendants arising from their false, misleading, and deceptive advertising of the prices for the corrective contact lenses they sell through their website (https://www.lens.com/).

2. Defendants distribute online advertisements displaying deceivingly low prices for contact lenses to lure consumers to their website. When consumers visit Defendants' website, they have to go through several steps to complete their order by providing details of their prescription, their doctor's information, and their personal and shipping information, before finally reaching a page with a final "Order Summary" showing the consumers their net total. What Defendants do not make clear on this page is that the consumer's net total includes a hidden charge for "Taxes & fees" that substantially increases the amount the consumer pays for contact lenses, far exceeding the prices that Defendants advertise by 50 to 80 percent.

3. Defendants do everything they can to hide the extra fees during the purchasing process in order to mislead consumers. For example, the only time Defendants reveal the "Taxes & fees" prior to purchase is if a consumer scrolls past a prominently displayed "Continue" button on the page where consumers input their shipping information. If a consumer does scroll past the "Continue" button, the only explanation as to what these costs include is provided through a small "i-link" that consumers must affirmatively click, but even that disclosure itself is

misleading because there is no breakdown of the taxes and fees, leaving consumers with the false impression that it must be some combination of (1) "taxes," and (2) "fees." In actuality, the "Taxes & fees" are 100 percent a "processing fee," which is only disclosed if a customer service representative provides a "Full Receipt" upon request by a consumer. Regardless, these charges are arbitrary, inflated, and untethered to any actual expense incurred by Defendants.

4.      As a result of Defendants' false and misleading advertising, Plaintiff and the proposed class have suffered damages. This practice has been going on for years and has cost California consumers significant sums in deceptive fees. Defendants should not be allowed to continue to profit from their deceptive practices.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Article VI, § 10 of the California Constitution and California Code of Civil Procedure § 410.10.

6.      This Court has personal jurisdiction over Defendants because Defendants intentionally avail themselves of the markets within this County by advertising, selling, and delivering their products to residents of this County through ecommerce channels. Defendants have such minimum contacts with this County that, under the circumstances, it would be fair and reasonable to require Defendants to come to this County and defend this action.

7.      Pursuant to Code of Civil Procedure § 395.5, venue is proper in Los Angeles County because one or more of the violations alleged in this Complaint arose in this County, because Defendants intentionally avail themselves of the markets within this County so as to render the exercise of jurisdiction by this Court just and proper. Plaintiff also viewed Defendants' online advertisements complained of herein while present in this County, purchased the products while present in this County and had them delivered here, so a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this County.

## PARTIES

8.      Plaintiff Adam Nail ("Plaintiff") is, and at all times relevant hereto was, an individual residing in Los Angeles, California. Plaintiff purchased contact lenses from Defendants' website while located in Los Angeles, California and had them delivered to his

residence there.

9.      Defendant, Lens.com, Inc., is a corporation organized and existing under the laws of the State of Nevada with its headquarters located at 4730 S. Fort Apache Rd Suite 300, Las Vegas, Nevada 89147-7947. On information and belief, Lens.com created and/or authorized the false, misleading, and deceptive advertisements complained of herein. On information and belief, Lens.com, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California.

10.      The true names and capacities of defendants Does 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants designated herein as a Doe defendant are in some manner responsible for the acts and occurrences set forth herein. Plaintiff will ask leave of court to amend this Complaint to show the true names and capacities of defendants Doe 1 through 10, inclusive, as well as the manner in which each Doe defendant is responsible, when the same has been ascertained.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

11.      Defendants sell corrective contact lenses online through their website, one of many retailers that operate in this industry. In order to attract consumers to their website, Defendants distribute advertisements on Google and other online search engines prominently advertising their prices for contact lenses.

12.      Defendants, however, advertise deceptively low prices for their contact lenses that mislead consumers as to the actual price of the contact lenses, and then, once those advertisements lure consumers to their website, gouge consumers with hidden fees. Defendants do not disclose these fees upfront, instead adding these fees surreptitiously at the end of the order process, raising the actual price Defendants charge for contact lenses by as much as 50 to 80 percent of the advertised price.

13.      The process starts when a consumer uses a search engine such as Google to search for websites that sell their preferred corrective contact lenses brand. In the illustrative example

below, the Google search "Acuvue 1 day moist 90 pack" retrieves the following (partial) results:



14.     As is clear, Lens.com advertises one of the lowest prices among these competitors, at $26.79 per pack. Compare this to the advertisement from one of the more reputable competitors, 1-800 Contacts, which advertises a 90-day pack at $71.99:



15.     When a consumer clicks on Defendants' advertisement, the consumer is redirected to a landing page on Defendants' website specific to the selected product, which displays the same pricing as the advertisement at $26.79 per 90 pack (assuming the consumer purchases at least eight boxes to qualify for the rebate offered):



**FIRST AMENDED CLASS ACTION COMPLAINT**

5

16.     A reasonable consumer would understand Defendants' advertised price to mean that they would pay $26.79 to purchase each ninety-day pack of 1-Day Acuvue Moist contact lenses from Defendants. No reasonable consumer would expect that the actual price would be increased by anywhere from 50 to 80 percent by surreptitiously added fees.

17.     After a consumer selects the number of boxes he or she wishes to purchase and clicks "Continue" on the screen above, the user is asked either to upload a prescription or enter the information manually. If the consumer chooses to enter the prescription information, the consumer is then asked to enter his or her doctor's name and address.

18.     After the consumer enters the required prescription and doctor information and clicks continue, the consumer is presented with a screen showing their "Shopping Cart":



19.     This screen again indicates that the consumer will receive the advertised price per box of contact lenses (assuming the consumer purchases the requisite number of boxes to trigger rebate eligibility and completes the rebate process).

20.    When a consumer clicks on the "Go To Checkout" box on this screen, they are presented with a page prompting them to either sign into their account, or provide their shipping information. The below picture is a true and accurate representation of what a consumer would see on a normal computer using a normal web browser when he or she arrives at this web page (without scrolling down on the page).



21.    If the consumer enters their shipping information and clicks "Continue", the consumer will move on to a final page in which they input their payment information and are provided an "Order Summary" before submitting their order. However, the "Order Summary" does not reveal that Defendants' tack on additional "Taxes and fees" and consumers consequently complete their purchase completely unaware of the hidden fees:



22.     The only way consumers can learn of the additional "Taxes & fees" prior to completing their purchase is if they *scroll past* the conspicuously placed "Continue" button on the page where they provide their *shipping information.* If the consumer scrolls past the "Continue" button on the Shipping Information page, the consumer is presented with an "Order Summary" different from the one presented on the final checkout page:



23.    In this version of the Order Summary, the consumer is shown an Order Summary listing (1) a "Subtotal" for the purchase without the rebate applied, (2) a vague line item for "Taxes & fees" that dramatically increases the amount the consumer will pay, (3) a "Total" price, (4) a credit for the "Mail-in Rebate" that closely corresponds with the "Taxes and fees" amount, and finally (5) a "Total After Rebate." This is the only place where the consumer is shown the "Taxes & fees" line item before purchase, and many consumers completely miss this version of the Order Summary because it is surreptitiously hidden below a prominently placed "Continue" button. Moreover, the entire page is designed to give the impression that the Mail-in Rebate offsets the "Taxes & fees" line item as the amounts closely align, when in fact, the Mail-in Rebate offsets the amount included in the "Subtotal" while the "Taxes & fees" remain untouched.

24.    A consumer can click on an "i-link" button for additional information as to what the "Taxes & fees" entail. However, all that is revealed is that "Taxes are tax recovery charges for tax obligations where applicable and the fees are compensation for servicing your order," which itself is misleading because in reality there are no taxes charged. Instead, it is 100 percent a processing fee that is only disclosed if a customer representative provides a "Full Receipt" upon a consumer's request. Moreover, this fee is deceptive because it does not relate to the actual

---

**FIRST AMENDED CLASS ACTION COMPLAINT**
9

operational costs associated with processing the order. It is entirely a profit generator.

25. By design and placement of the "Continue" button, Defendants mislead consumers into only viewing the version of the Order Summary screen that does not reveal the "Taxes & fees" line item separately, and consequently consumers are unaware that any such fees are added. And even when consumers do discover the version of the "Order Summary" revealing the additional "Taxes & fees," the disclosure provided misleads consumers into believing such "Taxes & fees" are actually related to taxes incurred or the costs of processing Plaintiff's and the putative Class Members' orders when in fact they are purely profit generators meant to mask the true cost of purchasing Defendants' products.

26. These material facts were not disclosed to Plaintiff or the putative class.

27. The "Taxes & fees" Defendants tag on are significant and can increase the amount a consumer should be paying based on the advertised prices by 50 to 80 percent. These "Taxes & fees" are nothing but a made-up charge. When they are factored in, the total cost of buying contacts from Defendants is essentially the same as the total cost of buying contact lenses from Defendants' more honest competitors.

## PLAINTIFF ADAM NAIL

28. On January 2, 2021, Plaintiff performed an online search for contact lenses and came across an advertisement from Lens.com offering contacts at a price much lower than other online retailers and visited Lens.com to purchase contact lenses.

29. Plaintiff went through the extensive order process described above, *supra.* Plaintiff placed Order Number #1381291016 consisting of 2 boxes at a price of $17.99 per box. After placing the order, Plaintiff received a receipt showing an un-itemized "Subtotal" of $64.76, plus a $7.95 shipping charge (which was later credited towards a future purchase) for a "Total" of $72.71. Plaintiff paid $28.78 in hidden fees, which does not appear anywhere on his receipt.

30. On November 11, 2022, Plaintiff placed order # 1051809498 consisting of 2 boxes at a price of $51.74 per box. After placing the order, Plaintiff received a receipt showing an un-itemized "Subtotal" of $152.95, a $9.95 shipping charge, and $7.95 credit, for a "Total" of $154.96. Plaintiff paid $49.47 in hidden fees, which does not appear anywhere on his receipt.

31.     To date, Plaintiff continues to wear contact lenses and continues to seek to purchase them at the most affordable price. When searching for contact lenses online, Plaintiff is continually presented with advertisements from Lens.com displaying prices significantly lower than those of competitors. Plaintiff would purchase contact lenses from Lens.com at the advertised prices, however, he has no way of determining whether the advertised prices are accurate and account for the "Taxes & fees" Lens.com charges consumers. Plaintiff is harmed due his inability to rely on the validity of the prices advertised by Lens.com despite his desire to purchase the most affordable contact lenses.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action on behalf of himself and a Class of similarly situated persons defined as follows:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased products from Defendants and were assessed a higher price than represented in advertisements and on Defendants' website.

33.     Excluded from the Class are Defendants, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff.

34.     Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

35.     **Numerosity**: At this time, Plaintiff does not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiff believes that the number of Class members are into the thousands, and thus are so numerous that joinder of all members is impractical. The number and identities of Class members is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

36.     **Commonality**: There are questions of law or fact common to the Class, which

include, but are not limited to the following:

    a. Whether during the class period, Defendants deceptively represented the price of the contact lenses available on their website;

    b. Whether Defendants' alleged misconduct misled or had the tendency to mislead consumers;

    c. Whether Defendants' alleged conduct constitutes violations of the laws asserted;

    d. Whether the "Taxes & Fees" charge is deceptive and unfair when Plaintiff and the putative class were not charged any taxes on the products they purchased;

    e. Whether the "Taxes & Fees" charge is deceptive and unfair when it was in actuality a 100% "Processing" fee;

    f. Whether the "Processing" fee is deceptive and unfair as it was excessive and not related to the actual costs of processing the purchase orders;

    g. Whether Plaintiff and members of the Class were harmed by Defendants' unfair, unlawful, deceptive, misleading, and/or false advertisements;

    h. Whether Defendants breached their contract with Plaintiff and the putative class by charging the deceptive, unfair and fraudulent fee at issue;

    i. Whether Plaintiff and the putative class were harmed by Defendant's breach of contract;

    j. Whether Defendants were unjustly enriched by charging Plaintiff and the putative class the deceptive, unfair and fraudulent fee at issue;

    k. Whether Plaintiff and the putative class were harmed by Defendant's unjust enrichment; and

    l. Whether an injunction is necessary to prevent Defendants from continuing to deceptively represent the cost of the products they offer for sale on their website.

37. **Typicality**: Like Plaintiff, many other consumers ordered products from Defendants' website based on Defendants' deceptive advertisements. Plaintiff's claims are

typical of the claims of the Class because Plaintiff and each Class member were injured by Defendants' false and/or misleading advertising. Plaintiff and the Class have suffered the same or similar injury as a result of Defendants' false, deceptive, and misleading representations. Therefore, Plaintiff's claims are typical of the claims of the Class and class treatment is appropriate.

38.     **Adequacy of Representation**: Plaintiff is committed to pursuing this action and has retained counsel competent who is experienced in prosecuting and resolving consumer class actions. Plaintiff will fairly and adequately represent the interests of the Class and does not have any interests adverse to those of the Class.

39.     **Acted or Refused to Act on Grounds Generally Applicable to the Class:** Consistent with Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to Plaintiff and Class members, making appropriate final injunctive relief and declaratory relief regarding the Class.

40.     **Superiority**: The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote because the damages or other financial detriment suffered by individual Class Members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against Defendants. Therefore, a class action is maintainable pursuant to Rule 23(b)(3).

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violations of the California Consumers Legal Remedies Act

### (By Plaintiff and on Behalf of the Class Against All Defendants)

41.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

42.     California Civil Code Section 1750, *et seq.*, entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a

"transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, inter alia, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

43. The products sold on Defendant's website constitute a "good" as defined by Civil Code section 1761(a).

44. Plaintiff and the Class members are each a "consumer" as defined by Civil Code section 1761(d) who purchased, or sought to purchase, contact lenses from Defendants' website.

45. Civil Code section 1770(a) provides in relevant part that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

> (9) [a]dvertising goods or services with intent not to sell them as advertised;

> (13) [m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions;

46. Defendants violated Civil Code Section 1770(a)(9) and (a)(13) by advertising artificially low prices for its contact lenses—advertising that its contact lenses were available for sale at one price, when in truth they were never available for sale at that deceptively low advertised price.

47. On information and belief, Defendants' violations of the CLRA, as set forth herein, were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely by Defendants' self-interest, monetary gain, and increased profit. Plaintiff further alleges that Defendants committed these acts knowing the harm that would result to Plaintiff and Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

48.     Defendants' advertising of artificially low prices and bait and switch scheme has misled and unfairly induced Plaintiff and the Class members to enter into transactions and to overpay for products. Plaintiff and the Class have been misled and unfairly induced to pay hidden fees above and beyond the product price advertised by Defendants. Therefore, Plaintiff and the Class members' money was taken by Defendants as a result of Defendants' false and misleading representations made in Defendants' advertisements, as explained above.

49.     Attached hereto as Exhibit A is the affidavit of Plaintiff pursuant to California Civil Code section 1780(d).

50.     Pursuant to this complaint, Plaintiff and the putative Class are also entitled to, and seek, injunctive relief prohibiting such conduct in the future. Moreover, Plaintiff has notified Defendants of the above-described violations of the CLRA pursuant to the procedure set forth in Civil Code section 1782(a) and reserves the right to amend the Complaint to assert actual damages on behalf of Plaintiff and the Class under the CLRA under Civil Code section 1782(a)-(d).

### SECOND CAUSE OF ACTION

**Violations of California Business and Professions Code section 17500**

**(By Plaintiff and on Behalf of the Class Against All Defendants)**

51.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

52.     California Business and Professions Code section 17500, *et seq*., prohibits public dissemination of any untrue or misleading advertising in connection with the disposal of any real or personal property or performance of services to consumers in the State of California.

53.     Defendants, by advertising misleadingly low prices for their contact lenses have made advertising statements that were untrue and/or misleading. Defendants made such advertisements with the intent of selling the contact lenses listed on their website. Defendants knew, or by the exercise of reasonable care should have known, that these advertisements were untrue and/or misleading. Defendants made such advertisements with the intent not to sell the advertised contact lenses at the price stated or as advertised.

54.     Defendants' statements were material in that they are likely to influence the purchasing decision of consumers, and actually deceived, or were likely to deceive, reasonable consumers.

55.     Plaintiff and the Class members reasonably relied on the representations and/or omissions made by Defendants in purchasing products from Defendants' website.

56.     As a direct and proximate result of Defendants' misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding the Class Products. In reasonable reliance on Defendants' false advertisements, Plaintiff and other Class Members purchased the Class Products. In turn Plaintiff and other Class Members ended up without the promised benefits and promotions, and therefore Plaintiff and other Class Members have suffered injury in fact.

57.     Plaintiff alleges that these false and misleading representations made by Defendants constitute a "scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

58.     Defendants have unfairly profited from the false advertising alleged herein and will be unjustly enriched in the future unless and until such conduct is permanently enjoined.

59.     Plaintiff is entitled to preliminary and permanent injunctive relief ordering Defendants to cease its false advertising.

### THIRD CAUSE OF ACTION

**Violations of California Business and Professions Code section 17200**

**(By Plaintiff and on Behalf of the Class Against All Defendants)**

60.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

61.     California Business and Professions Code section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." A business act or practice is unlawful if it is forbidden by local, state, or federal statutes, or by regulations or case law. A business act or

practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims. A business act or practice is "fraudulent", and advertising is untrue or misleading, if it is likely to deceive members of the public.

62. Here, Defendants' deceptive advertising of their violates each of the statute's "unfair," "unlawful," "fraudulent" and "untrue or misleading advertising" prongs.

63. Defendants committed unfair, unlawful, and fraudulent business acts and practices, including misleading or untrue advertising, in violation of Business and Professions Code section 17200, *et seq.*, by affirmatively and knowingly misrepresenting product prices in its advertisements. Defendants' acts and practices offend an established public policy of fee transparency in the marketplace, and constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

64. Defendants' conduct also constitutes an "unlawful" act under the UCL because, as detailed above, it also constitutes a violation of sections 1770(a)(9) and (a)(13) of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, *infra*, in that Defendants deceptively represent prices for their products on its website.

65. Defendants' business practices have misled Plaintiff and the proposed Class and will continue to mislead them in the future. Plaintiff relied on Defendants' misrepresentations about the falsely advertised prices of its products on its website.

66. Defendants have unfairly profited from the false advertising alleged herein and will be unjustly enriched in the future unless and until such conduct is permanently enjoined.

67. Plaintiff is entitled to preliminary and permanent injunctive relief ordering Defendants to cease its false advertising.

## **PRAYER FOR RELIEF**

68. Plaintiff, on behalf of himself and the Class, requests the following relief:

(a) An order certifying the Class and appointing Plaintiff as the representative for

the Class;

(b) An order certifying the undersigned counsel as Class counsel;

(c) Judgment for damages, including actual, statutory, treble and punitive, where applicable;

(d) Pre and post-judgment interest on the amount recovered;

(e) Attorney's fees and costs of this action; and

(f) For such other and further relief as may be just and proper, including but not limited to a preliminary and/or permanent order enjoining Defendants from engaging in the unlawful and unfair acts and practices described herein.

## **JURY DEMAND**

Plaintiff requests trial by jury on all issues so triable.


## **LTL ATTORNEYS LLP**


Dated: October 31, 2024                    /s/ Caleb H. Liang
                                           Caleb H. Liang (Admitted Pro Hac Vice)
                                           Allison Schmidt
                                           *Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **October 31, 2024,** a copy of the foregoing document

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1. California Consumers Legal Remedies Act, Civil Code section 1750;

2. California Business and Professions Code section 17500; and

3. California Business and Professions Code section 17200

was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system pursuant to Fed. Rule Civ. P. 5(b)(e) or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

Dated: October 31, 2024               /s/ Caleb H. Liang_____
                                      Caleb H. Liang (Admitted Pro Hac Vice)
                                      *Attorneys for Plaintiff and the Putative Class*

# Exhibit B-1

JS-6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM NAIL,<br><br>     Plaintiff,<br><br>v.<br><br>LENS.COM, INC.,<br><br>     Defendant. | Case No. 2:24-cv-02531-SB-E<br><br><br>ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER VENUE [DKT. NO. 24] |

Defendant Lens.com, Inc. is an online retailer that sells contact lenses. Plaintiff Adam Nail, who purchased two boxes of contact lenses through Defendant's website, brings this consumer class action alleging that Defendant misleads consumers by charging hidden fees that increase the price of the contact lenses to 50 to 80 percent above the advertised price. Defendant moves to transfer this case to the U.S. District Court for the District of Nevada pursuant to a forum-selection clause included in the terms and conditions of use of its website (the Terms of Use) or, alternatively, to dismiss the case based on Plaintiff's assertion of only California consumer-protection claims despite the Nevada choice-of-law provision in the Terms of Use. Because Plaintiff agreed to a contractually valid forum-selection clause, and because no extraordinary circumstance exists that would warrant not enforcing the clause, Defendant's motion to transfer is granted.

I.

Plaintiff filed this consumer class action alleging claims against Defendant for false and misleading advertising of its contact lenses under California's False Advertising Law (FAL), Consumer Legal Remedies Act (CLRA), and Unfair Competition Law (UCL). Dkt. No. 1.

1

Defendant is an online retailer that sells contact lenses through its website. Dkt. No. 1-1 ¶ 11. To attract customers, Defendant advertises online and prominently displays the prices of its contact lenses in its advertisements. *Id*. If a user clicks on Defendant's advertisement, the user is taken to Defendant's website, where the price of the contact lenses matches the advertised price. *Id*. ¶¶ 15–16. To continue through the purchasing process, the user clicks through multiple pages where he is required to provide various information. On each page, the user is required to click a button, which typically says "Continue" (or something similar), to proceed to the next webpage. *Id*. at 5–9. On the fourth page, the user is prompted to either "Continue Shopping" or "Checkout." *Id*. at 6. If the user chooses to checkout, he is asked on the fifth page to either sign in or enter his address for shipping information. *Id*. at 7; Dkt. No. 28 at 11.

On the fifth page, just below the "Continue" button, is a hyperlinked notice stating: "By continuing you agree to our Terms of Use & Privacy Policy." Dkt. No. 24 at 4, Dkt. No. 28 at 11. If the user scrolls past this "Continue" button without clicking it, there is an "Order Summary" that lists the taxes and fees applied. Dkt. No. 1-1 ¶ 22. These taxes and fees can increase the amount owed to 50 to 80 percent above the advertised price. *Id*. ¶ 27. Below the fees is a "Go To Checkout" button, directly beneath which is another hyperlinked notice of the Terms of Use identical to that beneath the "Continue" button. *Id*. at 7–9. The user must click either the "Continue" button or "Go to Checkout" button to continue to the sixth and final page of the ordering process. On the sixth page, the consumer is shown an order summary that makes no reference to the taxes and fees but provides a total cost, which includes the taxes and fees. *Id*. ¶ 21.

On January 2, 2021, Plaintiff purchased two boxes of contact lenses, each advertised at a price of $17.99 (for a total of $35.98). *Id*. ¶ 28–29. After accounting for shipping charges, Plaintiff paid an additional $28.78 in taxes and fees. *Id*. ¶ 29. Nearly two years later, Plaintiff purchased another two boxes of contact lenses, each of which was advertised at a price of $51.74 (for a total of $103.48). *Id*. ¶ 30. For this purchase, Plaintiff paid $49.47 in taxes and fees. *Id*.

Plaintiff brings this putative class action alleging violations of the CLRA, FAL, and UCL on behalf of himself and a putative class, which he defines as:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased products from Defendants and were assessed a higher price than represented in advertisements and on Defendants' website.

*Id.* ¶ 31.[1]

Defendant now moves to transfer this case to the District of Nevada based on a forum-selection clause in the Terms of Use. In relevant part, the Terms of Use state:

> These Terms and Conditions of Use shall be governed by and construed in accordance with the laws of the State of Nevada, without regard to choice of law rules. Any litigation arising out of or in connection with the use of this site shall be exclusively venued in state or federal courts located in Clark County, Nevada, with you and Lens.com waiving the right to trial by jury, agreeing that each party to litigation shall bear its own attorney's fees and costs, and waiving any objections to personal jurisdiction and the appropriateness of this venue, including those arising under the doctrine of forum non conveniens.

Dkt. No. 24 at 2. Defendant also moves to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6). Because the Court determines that this case should be transferred to the District of Nevada, it does not decide the motion to dismiss.

## II.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Section 1404(a) is a codification of the forum non conveniens doctrine and is the appropriate mechanism for enforcing a forum-selection clause. *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59–61 (2013). A valid forum-selection clause is "given controlling weight in all but the most exceptional cases." *Id.* at 63.

Federal law determines the "enforceability of the forum selection clause." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009). Such a clause is "presumptively valid," and the party challenging its validity bears a "heavy

---

[1] The parties appear to dispute whether this case involves a California or nationwide class. Although the complaint asserts only violations of California law, the class definition does not limit its reach to California consumers. The Court need not and does not decide this dispute, however, in ruling on this motion.

burden" to establish that the clause is unenforceable. *Id*. A forum-selection clause is invalid where "enforcement would contravene a strong public policy of the forum in which suit is brought." *Id*. (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

III.

A.

Before determining the effect of the forum-selection clause, the Court first addresses its validity. The parties agree that state law determines the validity of the forum-selection clause. Based on this agreement, the Court will apply state law without deciding its applicability. The parties disagree, however, about whether California or Nevada law applies. Because the parties agree that the result is the same under both bodies of law, Dkt. No. 30 at 2–3, the Court applies California law as a matter of convenience without deciding which law controls. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("As in *Nguyen*, we need not decide which State's law governs because both California and New York law dictate the same outcome.") (cleaned up).

In internet transactions, the party seeking to enforce a forum-selection clause must show that the nonmoving party had either actual or constructive notice of the terms and conditions. *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512 (9th Cir. 2023) (applying California and Massachusetts law); *see also Hauff v. Heward*, No. A-20-cv-809538, 2020 Nev. Dist. LEXIS 595, *12–13 (D. Nev. 2020) (addressing Nevada law). Generally, there are four types of agreements used by websites: clickwrap, scrollwrap, browserwrap, and sign-in wrap agreements. *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). Clickwrap agreements present website users with contractual terms on a pop-up screen and require users to click to continue, thereby taking an action indicating agreement with those terms. *Berman*, 30 F.4th at 856. Such agreements are generally enforceable. *Id*. Scrollwraps go a step further and require the user to scroll through the terms of use before clicking a consent box. *See Keebaugh*, 100 F.4th at 1014. Like clickwraps, scrollwraps are also generally enforceable. *Id*. Browserwrap agreements are at "the other end of the spectrum." *Berman*, 30 F.4th at 856. In these agreements, a hyperlink to the terms is located somewhere on the webpage—typically at the bottom—and continued use of the website purports to constitute assent by the user. *Id*. Courts are reluctant to enforce such agreements. *Id*. In the middle of the spectrum is a sign-in wrap agreement, which may be enforceable where "(1) the website provides reasonably conspicuous notice

of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 856). Whether the parties have expressed mutual assent in such an agreement is determined "under an objective reasonableness standard." *Oberstein*, 60 F.4th at 513.

1.

The first prong of this test considers both the visual placement of the notice and the context of the transaction. *See Keebaugh*, 100 F.4th at 1019–20. The Court analyzes each in turn.

a.

With respect to the visual placement, constructive notice of a sign-in wrap agreement must be reasonably conspicuous, which requires that the notice "be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Oberstein*, 60 F.4th at 515 (citations omitted). In analyzing this prong of the test, courts look to "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design." *Id*.

In this case, the conspicuous placement and contrasting font color of the hyperlink, and general design of the website provide adequate notice to a reasonably prudent internet user. Plaintiff states in his declaration that he made the purchases using either his computer or his iPhone. Dkt. No. 28-6 ¶ 4. An image of the website as seen on a computer screen or iPhone is reproduced below.[2] *See* Dkt. No. 28 at 11, Dkt. No. 30 at 5–7.

---

[2] Both images have been reduced in size from what a user would see on an iPhone 12 (or more recent variant with the same size screen) or 16-inch laptop computer.





The determination of whether notice is conspicuous is a "fact-intensive inquiry." *See Oberstein*, 60 F.4th at 514 (discussing the fact-intensive inquiry applied under California law). A review of the website on both a computer and an iPhone demonstrates the conspicuous nature of the Terms of Use hyperlink. First, the Terms of Use hyperlink is presented in black font against a white background—the same contrast as the rest of the writing on the page. *See Keebaugh*, 100 F.4th at 1020–21 (addressing the "contrasting font color" of white font on a dark background); *see also Slaten v. Dick's Sporting Goods, Inc.*, No. 2:22-CV-09366-WLH, 2024 WL 1136399, at *4 (C.D. Cal. Feb. 2, 2024) (finding that the notice of terms was conspicuous when it was in black, underlined font). Second, the Terms of Use hyperlink is presented directly below a bright red button that the user of the website is required to identify and click to continue to the subsequent step in the ordering process. *See Oberstein*, 60 F.4th at 516 ("Appellees' notice is conspicuously displayed directly above or below the action button . . ."); *see also Keebaugh*, 100 F.4th at 1020 (finding that visual placement was clear when the notice of terms was "[d]irectly beneath the operative Play button"). Third, the overall webpage design as it appears on the computer and phone is uncluttered and places the Terms of Use hyperlink sufficiently close to the "Continue" or "Go To Checkout" buttons while offsetting it with enough white space for it to stand out. *See Keebaugh*, 100 F.4th at 1021 (identifying that the webpage "lacks clutter and uses customary design elements denoting the existence of a hyperlink") (cleaned up). Finally, when a user hovers the mouse over the Terms of Use hyperlink, the font turns red, further causing it to stand out.

Plaintiff focuses on the fact that the hyperlinks are black and underlined instead of being a bright blue color. While "[s]imply underscoring words or phrases . . . will often be insufficient," *Berman*, 30 F.4th at 857, this is not always the case, *see Keebaugh,* 100 F.4th at 1020–21. In *Keebaugh*, the hyperlinks were the same color as the font on the rest of the page (i.e., white). 100 F.4th at 1010–11. The Ninth Circuit nevertheless found that the hyperlinks were conspicuous, noting that the color of the hyperlinks contrasted with the background of the remainder of the page, the terms-of-use hyperlink was directly beneath the "operative Play button," and the webpage was uncluttered. *See also Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) ("That the links are not blue, underlined, or capitalized does not undercut the district court's conclusion that Running Warehouse provided [the plaintiff] with 'reasonably conspicuous notice' of the Terms."). This case is similar. Although the hyperlinks are the same color as the font on the rest of the page, the black font stands out against the white background, the Terms of Use hyperlink is directly beneath the continue button, and the webpage is largely uncluttered. Moreover, other hyperlinks on the fifth

page—and throughout the purchasing process—are underlined in black font, indicating that this is the "customary design element[] denoting the existence of a hyperlink" on Defendant's website. *Id*. at 1021 (cleaned up). During oral argument, Plaintiff emphasized that the Terms of Use were presented only on page five of the purchasing process. But the fifth page is the first page that begins the actual checkout. On page four, the user must choose to either "Continue Shopping" or "Go To Checkout." Dkt. No. 1-1 at 6. Thus, the user is presented with the Terms of Use after choosing to checkout. Plaintiff has not shown that this is an unreasonable placement of those terms.

Plaintiff also relies on this Court's prior decision in *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089 (C.D. Cal. 2023). But this case is factually distinguishable. *See Oberstein*, 60 F.4th at 514 (stating that the inquiry is fact-intensive). In *Serrano*, the Court determined that notice of the Terms of Use was inconspicuous because: the font size was smaller than the rest of the font; the font was a lighter tone that blended into the white background, especially when contrasted with the rest of the text on the page, which was black; the terms of use hyperlink was not adjacent to the "Sign Up" button that the user was required to click; and the hyperlinks were not in blue or any other color that stood out. *Id*. at 1096. Unlike in *Serrano*, the font size in this case, although smaller than the surrounding text, is not "so small that it is barely legible to the naked eye." *Berman*, 30 F.4th at 856–57. Instead, the font is large enough for a user to identify and read the notice of the Terms of Use. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (applying California law and determining that the notice was conspicuous despite the "small font" because the font contrasted with the background and was in blue and underlined font); *see also Karim v. Best Buy Co.*, No. 22-CV-04909, 2023 WL 3801909, at *4 (N.D. Cal. June 2, 2023) (collecting cases where notice was conspicuous despite the font size being smaller than the surrounding print). And as discussed, unlike the lighter font in *Serrano*, the black font here is in sharp contrast to the white background. In short, the dark font directly beneath the "Continue" button on the uncluttered, white background of the webpage "is conspicuous and puts the reasonable user on notice that they are agreeing to be bound by the Terms of Service." *Keebaugh*, 100 F.4th at 1021.

Thus, the visual notice "puts a reasonable user on notice that they are agreeing to be bound by the Terms of Service." *Id*.

b.

The Court next addresses the context of the transaction.  Here, the context of the transaction supports the conspicuousness of the notice of the Terms of Use.  In *Oberstein*, the Ninth Circuit determined that the context of the transaction supported a determination that the notice was conspicuous where the user was presented with the terms and conditions "when creating an account, signing into an account, and completing a purchase." 60 F.4th at 515.  Purchasing a product, unlike a free trial, contemplates "some sort of continuing relationship," especially as it would relate to the purchase itself. *Id*. at 517.  This is even more true when the purchase is made for a consumable item—such as contact lenses—where repeat purchases are likely to occur given the general disposable nature of the good. Indeed, Plaintiff himself, made multiple visits to the website, making purchases on two separate occasions, during each of which he was required to go through the "extensive order process." Dkt. No. 1-1 ¶ 29.  Moreover, Plaintiff does not argue that such an ongoing arrangement caught him by surprise; on the contrary, he admits that he regularly agrees to be bound by such terms when he uses other websites. *See* Dkt. No. 28-6 ¶ 7 ("Typically, when I agree to be bound by the terms of use for a website . . .").

Thus, both the visual notice and the context of the transaction support a finding that the notice is conspicuous.

2.

The second prong of the constructive notice test analyzes "whether the user took some action that unambiguously manifested the user's assent to the agreement." *Oberstein*, 60 F.4th at 517.  Here, users are expressly alerted that, by continuing with the purchase, they "agree to our <u>Terms of Use</u> & <u>Privacy Policy</u>." Dkt. No. 28 at 11.  "As the *Berman* court emphasized, that is all that is required." *Oberstein*, 60 F.4th at 517. (finding the analysis "straightforward" where the user was alerted that by continuing, the user "agrees to our Terms of Use").

Because Defendant's website provides conspicuous notice of the terms to which the user agrees, and because a user making a purchase must unambiguously assent to those terms, the forum-selection clause in the Terms of Use is valid.

B.

Having determined that the forum-selection clause is valid, the Court next analyzes its enforceability.  "When the parties have agreed to a valid forum-

selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Atlantic Marine*, 571 U.S. at 62. A motion to transfer based on such a clause should only be denied under "extraordinary circumstances unrelated to the convenience of the parties." *Id*. When determining whether to transfer a case, courts typically weigh relevant public-interest considerations and the convenience of the parties. *Id*. However, where a valid forum-selection clause exists, "the plaintiff's choice of forum merits no weight," the court "should not consider arguments about the parties' private interests," and the normal choice of law rules do not apply. *Id*. at 63–64; *see also Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 (9th Cir. 2018) ("While a court may consider factors relating to the public interest (such as 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law,' those factors will rarely defeat a transfer motion.") (cleaned up). A valid "forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Id*. at 59–60. This is not an exceptional case.

Extraordinary circumstances or exceptional reasons to find that a forum-selection clause is invalid can be found where: "(1) the clause is invalid due to fraud or overreaching, (2) enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision, or (3) trial in the contractual forum will be so gravely difficult and inconvenient that [the litigant] will for all practical purposes be deprived of his day in court." *Sun*, 901 F.3d at 1088 (cleaned up).

Plaintiff does not assert any of the above-listed grounds for invalidating the forum-selection clause. Instead, he largely argues that the private-interest factors warrant the denial of the request to transfer. But these factors are deemed irrelevant under *Atlantic Marine* where, as here, a valid forum-selection clause exists. Nor do any of the arguments raised in support of the private-interest factors establish that trial would be "so gravely difficult and inconvenient" that Plaintiff would be deprived of his day in court if he were forced to litigate in Nevada. Plaintiff further asserts that this Court—a California court—would have greater familiarity with California law than a Nevada district court. But "federal judges routinely apply the law of a State other than the State in which they sit." *Atlantic Marine*, 571 U.S. at 67. And Plaintiff identifies no "exceptionally arcane" features

of California's consumer protection laws that "are likely to defy comprehension by a federal judge sitting in" Nevada. *Id*. at 68.[3]

Because the Court "must deem the private-interest factors to weigh entirely in favor of the preselected forum," *id*. at 64, and because the public factors do not rise to the level of an extraordinary or exceptional case, the forum-selection clause is enforceable. Transferring the case based on that clause is therefore appropriate.

IV.

The parties entered into a contract that contains a valid forum-selection clause. Plaintiff identifies no extraordinary circumstances that warrant rejection of that clause. Accordingly, the motion to transfer is granted. The case is hereby transferred to the United States District Court for the District of Nevada.

Date: June 20, 2024

_____
Stanley Blumenfeld, Jr.
United States District Judge

---

[3] Although the CLRA has an antiwaiver provision, such a provision does not necessarily preclude transferring the case to a different forum. *See Sun*, 901 F.3d at 1090 ("[A]n antiwaiver provision, without more, does not supersede the strong federal policy of enforcing forum-selection clauses."). Here, Plaintiff does not raise the antiwaiver provision, much less assert that the forum-selection clause contravenes California public policy. Thus, the antiwaiver provision does not bar transferring this case to Nevada.

# Exhibit C

Allison Schmidt (NV Bar No. 10743)
Email: allison@nevadaslawyers.com
10777 W. Twain Ave., Ste. 300
Las Vegas, NV 89135
Telephone: (702) 900-9040

MEYERS & FLOWERS, LLC
Matthew Herman (Admitted *Pro Hac Vice*)
Email: mh@meyers-flowers.com
3 N. Second Street, Ste. 300
Telephone: (630) 797-6333
Facsimile: (630) 845-8982

*Attorneys for Plaintiff MARY AGRELLA
FITZPATRICK and the putative class*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| MARY AGRELLA FITZPATRICK, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>LENS.COM, INC.,<br><br>                    Defendant. | Case No.: 2:24-cv-02203-JAD-EJY |

## <u>AMENDED CLASS ACTION COMPLAINT</u>

NOW COMES the Plaintiff, MARY AGRELLA FITZPATRICK, individually and on behalf of all others similarly situated, by and through their Counsel, MEYERS & FLOWERS, LLC, and brings this Illinois Consumer Class Action against Defendant, LENS.COM, INC., a Nevada Corporation, ("Lens.com" or "Defendant"), for unlawful, unfair, and deceptive business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815

ILCS 505/1 *et seq*;. Plaintiff, by and through her counsel, complains and alleges upon information and belief, among other things, the investigation made by Plaintiff and through her attorneys, as follows:

## NATURE OF THE CASE

1. This is a proposed consumer class action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant arising from their false, misleading, and deceptive advertising of the prices for the corrective contact lenses they sell through their website (https://www.lens.com).

2. Defendant distributes online advertisements displaying deceivingly low prices for contact lenses to lure consumers to their website. When consumers click on those advertisements and arrive at Defendant's website, they have to go through several steps to complete their order by providing details of their prescription, their doctor's information, and their personal and shipping information, before finally reaching a page with a final "Order Summary" showing the consumers their net total after they complete a mail-in rebate, labeled as their "Total After Rebate." What Defendant does not make clear on this final order screen is that the consumer's Total After Rebate includes a hidden charge "Taxes & fees" ("Deceptive Fees") that increases the amount the consumers pay for contact lenses by at least 30 percent to 50 percent, far exceeding the prices that Defendant advertises. Additionally, if located the "Taxes & fees" charge is itself misleading because in actuality no taxes are charged but instead a "Processing" fee is added that does not relate to the actual operational costs associated with processing the order.

3. Defendant does everything it can to intentionally hide the extra fees on their checkout pages which mislead consumers. Even when Defendant "discloses" the Taxes and fees in a small i-link that must be clicked-on, that disclosure itself is misleading because there is no breakdown of the Taxes and fees leaving consumers with the impression it must be some combination of 1) "taxes", and 2) "fees". In actuality, the "Taxes and fees" are 100 percent a

AMENDED CLASS ACTION COMPLAINT

"processing fee" which is only disclosed if a "Full Receipt" is requested and provided by a customer service representative.

4.     As a result of Defendant's false and misleading advertising, Plaintiff and the proposed Class Members have suffered damages. They purchased lenses they would not otherwise have bought or paid fees they would not otherwise have paid had they not been drawn in by Defendant's deceptively low prices for lenses. This practice has been going on for years and has cost consumers hundreds of thousands of dollars in Illinois, and perhaps millions across the country in Deceptive Fees. Defendant should not be allowed to continue to profit from their deception of consumers such as Plaintiff and the proposed Class Members.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 735 ILCS 5/2-209 over this matter in that all the actions complained of herein occurred in Geneva, Kane County, Illinois, and the Defendant has and does conduct business in Geneva, Kane County, Illinois.

6.     This Court has personal jurisdiction over Defendant because Defendant intentionally avails itself of the markets within this County by advertising, selling, and delivering their products to residents of this County through ecommerce channels. Defendant has such minimum contacts with this County that, under the circumstances, it would be fair and reasonable to require Defendant to come to this County and defend this action.

7.     Venue is proper in this Court pursuant to 735 ILCS 5/2- 101 because Defendant intentionally avails itself of the markets within this State and County so as to render the exercise of jurisdiction by this Court just and proper. Plaintiff also viewed Defendant's online advertisements complained of herein while present in this County, purchased the products while present in this County, and had them delivered in this County, so a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this County.

AMENDED CLASS ACTION COMPLAINT

8.     Plaintiff makes no claims under Federal law. Additionally, upon information and belief, any individual claim of the named Plaintiff or the putative Class Member is less than $75,000.00 and upon information and belief, the total amount in controversy for the entire putative Class is less than $5,000,000.

## PARTIES

9.     Plaintiff, Mary Agrella Fitzpatrick, is and at all times relevant hereto, was an individual residing in Kane County, Illinois.  Plaintiff purchased contact lenses from Defendant's website while located in Kane Country, Illinois and had them delivered to her residence here.

10.     Defendant, Lens.com, Inc., is a corporation organized and existing under the laws of the State of Nevada with its headquarters located at 4730 S. Fort Apache Road, Suite 300, Las Vegas, Nevada 89147-7947. Upon information and belief, Lens.com created and/or authorized the false, misleading, and deceptive advertisements complained of herein. Upon information and belief, Lens.com, directly and through its agents, has substantial contacts with and receive substantial benefits and income from and through the State of Illinois.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

11.     Defendant sells corrective contact lenses online through their website, one of many retailers that operate in this industry. In order to attract consumers to their website, Defendant distributes advertisements on Google and other online search engines prominently advertising their prices for contact lenses.

12.     Defendant, however, advertises artificially low prices for their contact lenses that mislead consumers as to the actual price of the contact lenses.  The advertisements then lure consumers to their website and gouge consumers with hidden added fees. Defendant does not disclose these fees upfront, instead adding these fees surreptitiously at the end of the order process, and these fees raise the actual price Defendant charges for contact lenses by 30 percent to 50 percent over the price they advertise.

4

13.     Many consumers do not notice that these fees are being added, which is by design, as Defendant attempts to conceal these fees, as described below. To make matters worse, Defendant still does not disclose the amount of the additional fees charged. Instead, Defendant's website displays only a total purchase price (Subtotal) that includes the products and additional fees, but consumers are required to click on an additional small i-link to find out the amount of additional fees assessed, which is still misleading.

14.     The process starts when a consumer uses a search engine, such as Google, to search for websites that sell their preferred corrective contact lenses brand. In the illustrative example below, the Google search "Acuvue 1 day moist 90 pack" retrieves the following (partial) results:



15.     As is clear, Lens.com advertises one of the lowest prices among these competitors, at $26.79 per pack. Compare this to the advertisement from one of the more reputable competitors, 1-800 Contacts, which advertises a 90 pack at $71.99:



16.     When a consumer clicks on Defendant's advertisement, the consumer is redirected to a landing page on Defendant's website specific to the selected product, which displays the same pricing as the advertisement at $26.79 per 90 pack (assuming the consumer purchases at least eight boxes to qualify for the rebate offered):

5

AMENDED CLASS ACTION COMPLAINT



17.     A reasonable consumer would understand Defendant's advertised price to mean that they would pay $26.79 to purchase each ninety-day pack of 1-Day Acuvue Moist contact lenses from Defendant. No reasonable consumer would expect that the actual price would be increased by 30% to 50% with surreptitiously added fees.

18.     After a consumer selects the number of boxes he or she wishes to purchase and clicks "Continue" on the screen above, the user is asked either to upload a prescription or enter the information manually. If the consumer chooses to enter the prescription information, the consumer is then asked to enter his or her doctor's name and address.

19.     After the consumer enters the required prescription and doctor information and clicks continue, the consumer is presented with a screen showing their "Shopping Cart":



20.     This screen indicates that the consumer will receive the advertised price per box of contact lenses (assuming the consumer purchases the requisite number of boxes to trigger rebate eligibility) after the consumer completes the process to obtain a rebate from Defendant.

21.     When a consumer clicks on the "Go to Checkout" box on this screen, they are

presented with a page prompting them to either sign into their account or provide their shipping information. The picture below is a true and accurate representation of what a consumer would see



on a normal computer using a normal web browser when he or she arrived at this web page (without scrolling down on the page).

22.    If the consumer enters their shipping information and clicks "Continue", the consumer will move on to a page asking for payment information.  This page is designed deceptively in that the typical consumer will fill in the information required and click "Continue" to proceed with the order process.  Defendant designed the page in such a way that a typical consumer would not scroll down and see the "Order Summary" otherwise it would not place "Continue" link in a position where the "Order Summary" is not seen. However, if the consumer scrolls down this page before clicking "Continue", the consumer will be presented with an "Order



Summary":

23.     In this Order Summary, the consumer is shown a per box price that matches the advertised price, but the order summary also shows that: (1) the consumer will be charged a subtotal amount that greatly exceeds the advertised price and will only net the advertised price after completing a mail-in rebate; and (2) the consumer will be charged a vague line item for "Taxes & fees" that dramatically increases the amount the consumer will pay, even after the mail-in rebate. This is the only place where the consumer is shown the "Taxes & fees" line item, and many consumers completely miss this Order Summary, by design, because it requires them to scroll down past the "Continue" button, which many average consumers would not think to do.

24.     If the consumer scrolls down and notices the revised order summary, and notices the "Fees & taxes" line item the consumer has the ability to click on a small i-link button the purportedly will provide them additional information as to what the "Taxes and fees" entail, but all it provides is that "Taxes are tax recovery charged for tax obligations where applicable and the fees are compensation for servicing your order" which in itself is misleading because in reality there are no taxes charged.  Instead, it is 100 percent a processing fee that is only disclosed if a customer representative provides a "Full Receipt".  Moreover, this fee is also deceptive because it does not relate to the actual operational costs associated with processing the order as one would expect a "Processing" fee to cover.

25.     If the consumer presses "Continue" to move on the following page, the consumer is presented with a form to complete their payment information as well as a second version of an Order Summary. This Order Summary has the same "Order Total" and "Total After Rebate" numbers as the previous version that the consumer would only see if they scrolled down past the "Continue" button but does not separately identify the "Taxes and fees" that Defendant is adding to the order.



26.     By design and the placement of a "Continue" link, many consumers only review this Order Summary screen, not the previous one that breaks out the "Taxes & fees" line item separately and are not presented the hidden "Taxes and fees" line item. They also do not notice that the "Order Total" on this Order Summary is much higher than what appeared on the Shopping Cart screen above, which was based on the prices Defendant actually advertised without any additional "Taxes & fees."

27.     The amount they tag on increases the amount the consumer should be paying based on the advertised prices by 30 percent to 50 percent. This amount greatly exceeds any reasonable tax owed on the purchase, and Defendant makes no effort to explain what taxes or fees are covered by this line item. That is because this is not actually a tax on the lenses purchased or a fee for any service; it is a made-up charge that Defendant adds to increase the price that is totally unrelated to the actual costs in processing the order. And when these fees are factored in, the total cost of buying contacts from Defendant is essentially the same as the total cost of buying contact lenses from Defendant's more honest competitors.

28. Defendant, therefore, misleads even those consumers who click on the "Taxes and fees" i-link by representing the fees they charge are related to the costs of processing the Plaintiff's and the putative Class Members' order. In fact, Defendant never discloses to purchasers that the fees it assesses upon purchase are purely profit generators.

29. On September 19, 2022, Plaintiff found contacts for purchase at the Defendant's website and went through the extensive order process as described herein. Plaintiff placed Order Number #1389120063 consisting of 4 boxes of contacts at a price of $70.54 and 3 boxes of solution at $6.99 a box.

30. After placing the Order, Plaintiff received the receipt below showing an order total of $395.07 and a total after rebate price of $310.07. The small font below this total states "For complete order details, **click here**". Plaintiff's credit card was charged $416.04.

AMENDED CLASS ACTION COMPLAINT

Having trouble viewing? Click to view details.

| Contact Lenses | Rebates | Vision Test |

**Thank You For Your Order!**

Hello Mary,

Thank you for choosing Lens.com. See your order summary below.

**Order Details**

Order #: **1389120063**    Ordered On: **9/19/2022**

**Shipping Details**

Shipped To:    **Mary Fitzpatrick**    Shipping Method: **Standard**
**4n220 Fox Mill Blvd**
**Saint Charles, IL 60175-**
**7768**    Estimated Arrival: **September 28, 2022 - September 30, 2022**
**US-United States**

**Product Information**

- **1-Day Acuvue Moist Multifocal 90PK for Kevin Fitzpatrick 4 boxes**
- **Free Lens Case**

| | |
|---|---|
| **Order Total:** | $395.07 |
| 1-Day Acuvue Moist Multifocal 90PK Mail-in Rebate: | $85.00 |
| **Total After Rebate:** | $310.07 |

For complete order details, **click here**.

Congratulations Mary! You qualified for a rebate. We offer a generous 3 month (12 week) window from your order shipped date for you to submit your rebate. Please go to your personalized Rebate Center for instructions on how to submit your rebate. You will need to include the Manufacturer's Proof of Purchase (found on the ack or side of your contact lens box) with your submission.

31.    If a person clicks on the link "For complete order details, **click here**" the receipt on the screen below appears revealing the items being purchased at the prices advertised followed by a subtotal of $406.09 and a shipping charge of $9.95 for a total of $416.04.  However, the items on the receipt only total $313.08 when added together, including Shipping.

AMENDED CLASS ACTION COMPLAINT



32.    Plaintiff, as a reasonable consumer, and the putative Class Members believed the Subtotal was the addition of multiple items purchased.  Instead, there was a Taxes and fees charge of $102.96 hidden in the "Subtotal" and not a line item like the Shipping charge.  Furthermore, the Taxes and fee charge was nothing more than a 100 percent Processing fee which was only revealed when a customer service representative of the Defendant emailed a "Full Receipt" to the Plaintiff long after the purchase as described below.

33.    In late September, or early October, Plaintiff received her Order.  Plaintiff has an FSA, or Flexible Spending Account, and submitted the receipt from paragraph 31 above.  Her flexible spending account card issuer denied the payment of $416.04 because it did not match the receipt provided as items listed only totaled $313.08 including the Shipping charge.

34.    Plaintiff was told by her FSA provider to contact Defendant to work out the discrepancy. After multiple phone calls, Plaintiff spoke to an agent of Defendant who realized the issue and stated, "Oh, you want a Full Receipt" and told Plaintiff she would email her a "Full Receipt".

35.    On or about December 13, 2022, Defendant emailed Plaintiff a "Full Receipt" which for the first time contained a line item for "Processing" of $102.96.

AMENDED CLASS ACTION COMPLAINT

| Order #: | Date Ordered: | Shopper: | Email Address: |
|---|---|---|---|
| 1389120063 | 09/19/2022 | Mary Fitzpatrick | mfitzpatrick630@sbcglobal.net |

| Billing Information | Shipping Information |
|---|---|
| Mary Fitzpatrick<br>4n220 Fox Mill Blvd<br>Saint Charles, IL 60175-7768<br>630-8427929 | Mary Fitzpatrick<br>4n220 Fox Mill Blvd<br>Saint Charles, IL 60175-7768<br>630-8427929 |

| Product and Prescription Information | Quantity | Unit Price | Subtotal | Status |
|---|---|---|---|---|
| **1-Day Acuvue Moist Multifocal 90PK (SKU: J23)**<br><br>**Eye**: Left **Base Curve**: 8.4 **Diameter**: 14.3 **Power**: -5.50 **Addition**: Mid (+1.50D to +1.75D) — **Patient:** Kevin Fitzpatrick **Doctor:** Lenscrafters **Doctor Phone:** 847-760-6200 | 2 | $ 70.54 | $ 141.08 | Shipped On 9/22/2022 |
| **1-Day Acuvue Moist Multifocal 90PK (SKU: J23)**<br><br>**Eye**: Right **Base Curve**: 8.4 **Diameter**: 14.3 **Power**: -6.00 **Addition**: Mid (+1.50D to +1.75D) — **Patient:** Kevin Fitzpatrick **Doctor:** Lenscrafters **Doctor Phone:** 847-760-6200 | 2 | $ 70.54 | $ 141.08 | Shipped On 9/22/2022 |
| **Free Lens Case** | | | | |
| **Mail-In Rebate** | | | | |
| **biofresh!22 Multi-Purpose Solution** | | | | |
| | | **Subtotal:** | | $ 303.13 |
| | | **Processing:** | | $ 102.96 |
| | | **Shipping:** | | $ 9.95 |
| | | **Total:** | | $ 416.04 |

AMENDED CLASS ACTION COMPLAINT

36. This receipt was provided months after Defendant accepted Plaintiff's money, and long after the products had been delivered, for the first time actually disclosed the hidden charge of $102.96 as a Processing Fee. Even when the Processing Fee is disclosed it is misleading because it is unrelated to the actual costs of processing the order but is instead a profit generator.

37. To date, Plaintiff and the putative class face an imminent or actual threat of future harm due to Lens.com deceptive and false advertising. Plaintiff continues to purchase contact lenses online throughout the year for her and her family at affordable prices. When searching for contact lenses online, Plaintiff is continually presented with advertisements from Lens.com displaying prices significantly lower than those of competitions. Plaintiff would purchase contact lens from Lens.com if she were able to trust the advertised prices would not be inflated with hidden fees but she is unable to determine whether the advertised prices are accurate and account for "Taxes and fees" and/or a Processing Fee. Accordingly, she will be unable to rely on Lens.com advertised prices in the future and therefore will not purchase the products from Lens.com.

## CLASS ACTION ALLEGATIONS

38. Excluded from the Class is Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff.

39. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with her motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

40. **Numerosity**: At this time, Plaintiff does not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiff believes that the number of Class Members are into the thousands, and thus are so numerous that joinder of all Members is

impractical. The number and identities of Class Members is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

41 **Commonality**: There are questions of law or fact common to the Class, which include, but are not limited to, the following:

a. Whether during the class period, Defendant deceptively represented the price of the contact lenses available on their website;

b. Whether the "Taxes & fees" charge is deceptive and unfair when in actuality it is 100% a Processing fee;

c. Whether the "Taxes & fees" charge is deceptive and unfair when Plaintiff and putative class were not charged taxes on the products they purchased;

d. Whether Defendant's Processing fee is unfair and deceptive when it is a fee unrelated to the costs of processing orders:

e. Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

f. Whether Defendant's alleged conduct constitutes violations of the laws asserted;

g. Whether Plaintiff and Class Members were harmed by Defendant's unfair, unlawful, deceptive, misleading, and/or false advertisements; and

h. Whether an injunction is necessary to prevent Defendant from continuing to deceptively represent the cost of the products they offer for sale on their website.

42. **Typicality**: Like Plaintiff, many other consumers ordered products from Defendant's website based on Defendant's deceptive advertisements. Plaintiff's claims are typical of the claims of the Class because Plaintiff and each Class Member were injured by Defendant's false and/or misleading advertising. Plaintiff and the Class have suffered the same or similar injury as a result of Defendant's false, deceptive, and misleading representations. Therefore, Plaintiff's claims are typical of the claims of the Class and Class treatment is appropriate.

43. **Adequacy of Representation**: Plaintiff is committed to pursuing this action and has retained counsel competent who is experienced in prosecuting and resolving consumer class actions. Plaintiff will fairly and adequately represent the interests of the Class and does not have any interests adverse to those of the Class.

44. **Superiority**: The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote because the damages or other financial detriment suffered by individual Class Members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against Defendant.

## CAUSE OF ACTION

**Violations of the Illinois Consumer Fraud and Deceptive Practices Act 815 ILCS 505/1, *et. seq.* (By Plaintiff and on Behalf of the Class)**

45  Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

46. Section 2 of the Illinois Consumer Fraud  and Deceptive Business Practices Act, (the "Act'")  provides "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…are unlawful whether any person has in fact been misled, deceived, or damaged thereby."

47. In addition, Section 2 of the Act prohibits "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' 815 ILCS 510/1, *et. seq.* ("UDTPA").  815 ILCS 510/2 the UDTPA provides: (a) A person engages in a deceptive trade

16

practice when, in the course of his or her business, vocation, or occupation, the person:

(9) advertises goods or services with the intent not to sell them as advertised.

48.    The Act and UDTPA apply to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

49    The products sold on Defendant's website constitute "merchandise" within the meaning of 505/1(b) and its sale is within the meaning of "trade" or "commerce" under the Act.

50.    Plaintiff and the Class Members are each a "consumer" as defined by Section 505/1(e) of the Act who purchased, or sought to purchase, contact lenses and supplementary products from Defendant's website.

51,    Defendant, Plaintiff, and Class Members are all a "person" as defined by 505/1c of the Act.

52.    Defendant violated the Act and UDPTA by advertising artificially low prices for its contact lenses—advertising that its contact lenses were available for sale at one price, when in truth they were never available for sale at that deceptively low advertised price. Defendant's advertising of artificially low prices has misled and unfairly induced Plaintiff and the Class Members to enter into transactions and to overpay for products. Plaintiff and the Class Members have been misled and unfairly induced to pay hidden fees above and beyond the product price advertised by Defendant, the Processing fee. Therefore, Plaintiff and the Class Members' money was taken by Defendant as a result of Defendant's false and misleading representations made in Defendant's advertisements, as explained above.

53.    Defendant further violated the Act through its conduct described above when it engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of its trade and commerce including but not limited to: charging a fee Defendant labeled "Taxes & fees", thereby suggesting some portion of the fee was

for taxes, when Plaintiff was not charged for tax; charging a fee Defendant labeled "Taxes & fees" when in truth it was a 100% "Processing" fee; charging what was ultimately a 100% "Processing" fee, but labeling it a charge for "Taxes & Fees" at the point of sale completion; failing to disclose to Plaintiff that the "Taxes & fees" charge was entirely a "Processing" fee; even assuming the "Processing" fee was adequately disclosed to Plaintiff, charging a "Processing" fee that does not relate to the actual operational costs associated with processing the order, but instead charging an excessive amount for the "Processing" fee (because the amount collected far outweighed the actual costs of processing the order), and failing to disclose to Plaintiff that the "Processing" fee was excessive and/or did not relate to the actual operational costs associated with processing the order.

54.     Defendant committed the acts described herein intending for Plaintiff and the Class Members to rely to them and Plaintiff and the Class Members did so rely on and suffered actual damages by making purchases they would not have otherwise made.

55.     Pursuant to section 10(a) of the Act, Plaintiff may bring this cause of action for actual damages, punitive damages, and any other relief the court deems appropriate.

**PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and the Class, requests the following relief:

A.     An Order certifying the Class and appointing Plaintiff as the representative for the Class;

B.     An Order certifying the undersigned counsel as Class Counsel;

C.     Restitution for Plaintiff and the Class Members of the Processing fees paid;

D.     Judgment for damages, including actual, statutory, treble and punitive, where applicable;

E.     Pre- and post-judgment interest on the amount recovered;

F.     Attorney's fees and costs of this action; and

G.    For such other and further relief as may be just and proper, including but not limited to a preliminary and/or permanent order enjoining Defendant from engaging in the unlawful and unfair acts and practices.

Respectfully submitted,

MEYERS & FLOWERS, LLC

By: **_/s/ Matthew Herman_**
        Matthew Herman

MEYERS & FLOWERS, LLC
Matthew Herman (Admitted Pro Hac Vice)
Email: mh@meyers-flowers.com
3 N. Second Street, Ste. 300
Telephone: (630) 797-6333
Facsimile: (630) 845-8982

Allison Schmidt (NV Bar No. 10743)
Email: allison@nevadaslawyers.com
10777 W. Twain Ave., Ste. 300
Las Vegas, NV 89135
Telephone: (702) 900-9040

*Attorneys for Plaintiff MARY AGRELLA FITZPATRICK and the putative class*

AMENDED CLASS ACTION COMPLAINT

# Exhibit C-1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARY ARGELLA FITZPATRICK, | |
| Plaintiff, | No. 24 CV 2700 |
| v. | Judge Manish S. Shah |
| LENS.COM INC., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Fitzpatrick bought contact lenses from defendant Lens.com's website. Fitzpatrick alleges that Lens.com advertised certain prices online, but the actual prices at checkout were higher because of hidden fees and charges. She brings a putative class action alleging defendant violated the Illinois Consumer Fraud Act. Defendant Lens.com moves to transfer venue to the District of Nevada under 28 U.S.C. § 1404(a) and, alternatively, moves to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, the motion to transfer is granted.

## I.   Legal Standard

For convenience and in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought or to any district to which all parties have consented. 28 U.S.C. § 1404(a). A forum-selection clause "may be enforced through a motion to transfer under § 1404(a)." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). When the parties

agree to be bound by a forum-selection clause, a district court should transfer the case to the forum specified unless extraordinary circumstances apply. *Id.* at 62. With a forum-selection clause, the plaintiff's choice of forum holds no weight, the parties' private interests are immaterial, and the proposed court's familiarity with the law that must govern the action is no longer relevant since those rules would not follow the transferred case. *Id.* at 64–65. The party opposing transfer "bears the burden of establishing that the transfer to the forum for which the parties bargained is unwarranted." *Id.* at 63.

## II.    Facts

Defendant Lens.com, Inc. sells corrective contact lenses online. [1-1] ¶ 11.[1] Plaintiff Mary Fitzpatrick bought contacts through Lens.com's website. *Id.* ¶¶ 29–30. Customers like Fitzpatrick can select contact lenses to buy, provide their prescription information, and navigate to the "shopping cart" page. *Id.* ¶¶ 18–19. To move from the shopping cart to checkout, the user must click "Go To Checkout." *Id.* ¶ 21. Clicking prompts the user to either sign in to their account or provide their shipping

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from plaintiff's complaint, [1-1], and three exhibits attached by defendant to its motion to transfer, [5-2]. The exhibits include an affidavit describing Lens.com's navigation process during checkout, images of the webpages, and the Terms & Conditions of Use hyperlinked on those pages. [5-2] at 2–17. Because the webpages are referred to in the complaint and central to its claims, I take judicial notice of these exhibits. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Plaintiff disputes the accuracy of the images only to the extent that they are reproduced in a size that is too large. [9] at 4 n.3. The larger images of the "Continue" and "Go To Checkout" buttons are reproduced here with the understanding that the screenshots of the websites may not be the size that plaintiff and other users encountered.

2

information. *Id.* For a user shopping on a computer, the page requesting shipping information looks like this:



[1-1] ¶ 21; [5-2] at 17. The "Continue" button is a red rectangle with white text. *Id.* Underneath the button is the text, in smaller black font, "By continuing you agree to our Terms of Use & Privacy Policy."



[5-2] at 17. The underlined portion of the text is hyperlinked. *Id.* at 3. If the user hovers their mouse over the hyperlinked text, the text changes in color from black to red. *Id.* If they click on the hyperlinked text, they are directed to a separate page with

3

Lens.com's Terms of Use. *Id.* at 3–4. The Terms of Use contains a forum-selection clause:

> These Terms and Conditions of Use shall be governed by and construed in accordance with the laws of the State of Nevada, without regard to choice of law rules. Any litigation arising out of or in connection with the use of this site shall be exclusively venued in state or federal courts located in Clark County, Nevada, with you and Lens.com waiving the right to trial by jury, agreeing that each party to litigation shall bear its own attorney's fees and costs, and waiving any objections to personal jurisdiction and the appropriateness of this venue, including those arising under the doctrine of forum non conveniens.

*Id.* at 3.

The user can scroll past the "Continue" button without clicking it. [1-1] ¶ 22. If the user scrolls down, there's an order summary section at the bottom of the same page. *Id.* The order summary page looks like this:



[5-2] at 17. Like the "Continue" button, the "Go to Checkout" button is a red rectangle with white text. *Id.* Underneath the button is the same text with the hyperlinked feature.

**Go To Checkout**

By continuing you agree to our <u>Terms of Use</u> & <u>Privacy Policy</u>

*Id.* The user must click either the "Continue" button (below the shipping information section) or "Go To Checkout" button (below the order summary) to move on to the next page. [1-1] ¶ 22; [5-2] at 3. After the user clicks either button, they are directed to fill in their payment information and submit their order as the final step of checkout.[2] [1-1] ¶ 25.

Fitzpatrick filed suit in the Circuit Court of Kane County, Illinois, alleging Lens.com violated the Illinois Consumer Fraud Act. [1-1]. Defendant Lens.com timely removed the case to this court under the Class Action Fairness Act.[3] [1].

---

[2] Plaintiff alleges other facts about the advertising and pricing of defendant's products, but I limit the discussion of facts to those relevant in resolving defendant's motion to transfer.

[3] This court has subject matter jurisdiction over the state-law claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), which creates federal jurisdiction if "(1) a class has 100 or more class members; (2) at least one class member is diverse from at least one defendant; and (3) there is more than $5 million, exclusive of interest and costs, in controversy in the aggregate." *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017). CAFA jurisdiction is satisfied because the proposed class would exceed 100 members; minimal diversity is met because at least one member of the class is a citizen of a different state than a defendant; and the amount in controversy alleged exceeds $5,000,000. [1] ¶¶ 5–6, 16–28; *Blomberg v. Serv. Corp. Int'l,* 639 F.3d 761, 763 (7th Cir. 2011) (a defendant's "good-faith estimate" of the amount in controversy need only be plausible and supported by evidence).

## III.   Analysis

### A.   Contract Formation

There's no dispute that Lens.com's Terms of Use designates venue in Nevada. Fitzpatrick doesn't argue that her claim falls outside the scope of the forum-selection clause. The only dispute is whether Fitzpatrick entered into a valid contract with Lens.com. The parties disagree about whether Illinois or Nevada law applies, but the same general principles of contract formation apply under either state's law. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) ("Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question."); *Grisham v. Grisham*, 128 Nev. 679, 685 (2012) (under Nevada law, a contract "requires mutual assent or a meeting of the minds on the contract's essential terms") (cleaned up).[4] The contract contained a Nevada choice of law provision, so I apply Nevada law. *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 775 (7th Cir. 2014) (holding that the law designated in a contract's choice of law clause should be used to determine the validity of the forum selection clause).  Under Nevada law, a party must have actual or constructive notice of a contract's terms to manifest assent. *Cf. Adelson v. Harris*, 133 Nev. 512, 518 (2017); *see also In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F.Supp.2d 1058, 1065 (D. Nev. 2012) (applying Nevada law and finding no manifestation of assent where an inconspicuous hyperlink did not provide constructive notice).

---

[4] The parties agree that there is no substantive difference between the states' laws. *See* [9] at 5 n.4; [5-1] at 9; [13] at 3.

6

There are two types of online contracts: clickwrap and browsewrap. *Domer v. Menard, Inc.*, 116 F.4th 686, 694–95 (7th Cir. 2024). Clickwrap agreements require a customer to affirmatively indicate assent by clicking or checking a box. *Id.* at 694. Browsewrap agreements, on the other hand, "provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions." *Id.* at 694–95 (citing *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023)). Browsewrap agreements are rarely enforced. *Id.* at 695. A wide range of online contracts are hybrid agreements that fall "somewhere in between." *Id.* A "notice of deemed acquiescence and a link" to terms of an agreement on a webpage is a type of hybrid-wrap agreement. *Id.* When agreement is largely passive, as is the case here, a contract is enforceable only if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* (citation omitted).

## 1.   *Reasonably conspicuous notice*

Notice is evaluated from the perspective of a reasonable online shopper. *Domer*, 116 F.4th at 695. A reasonable online shopper is assumed to have basic familiarity with websites, hyperlinks, and online agreements. *Id.* Whether a website provided reasonable notice to the user is taken "in light of the whole webpage." *Id.* Five factors are relevant, though none are dispositive: "(1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial

placement of the hyperlink; and (5) the temporal relationship to the user's action." *Id.*

The first factor looks at the presence of clutter on a screen that may divert the user's attention from the disclosure. *See Domer*, 116 F.4th at 696. A webpage may be cluttered if it contains multiple fields or buttons, unnecessary information like promotions and advertisements, different fonts and colored text, or too many hyperlinks. *See id.* (finding webpage to be uncluttered because it had ample white space, information organized neatly into a few boxes and columns, less than a handful of hyperlinks, and font in a consistent color and typeface); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) (finding notice was not reasonably conspicuous where order page contained between fifteen and twenty-five links, text in multiple font sizes and colors, and multiple buttons and promotional advertisements).

Lens.com's webpage contains sections for the user's shipping information and an order summary. The shipping information section includes fields for the user's address, an optional box that turns on order notifications via text, a click-down box where the user can select the shipping method, and the "Continue" button with the disclosure, "By continuing you agree to our <u>Terms of Use</u> & <u>Privacy Policy</u>" below it. There are two other hyperlinks the user can click on: a hyperlink to sign into the user's account and a hyperlink for help with filling in a shipping address. This presentation is relatively uncluttered: there are no distracting advertisements and promotions, there are only four hyperlinks, and three buttons. The font varies in size, but it's in a consistent typeface and there are only three colors (black, red, and white).

The background is white and provides contrast for the black-colored text. There's also ample white space. The order summary section is more crowded. It includes an image of the product(s) in the cart, drop down boxes to select quantity, hyperlinks to update doctor and prescription information, an optional box to turn on automatic refills of the product, and a hyperlink to enter a promotional code. The bottom right of the page is a column that shows the total price after taxes, fees, and rebate is applied. There's also a drop-down box to select the shipping method. The order summary contains a few elements that are non-standard or extraneous: boxes showing a free lens case with purchase, how much the user saved on the order after rebate, and how much the user saved on their order by shopping with Lens.com. Even with the presence of these additional elements, the order summary page isn't so crowded as to make the disclosure underneath the "Go To Checkout" button inconspicuous. Taken as a whole, the webpage's design is relatively stream-lined and uncrowded with distracting elements. The two disclosures below the "Continue" and "Go To Checkout" buttons were reasonably conspicuous within this context.

If terms or conditions are hyperlinked rather than displayed directly to the user, there must be a "clear prompt directing the user to read them." *Domer*, 116 F.4th at 696. The hyperlink must be set apart from other text in some way. *Id.* Design elements like bold-face, capitalization, or contrasting color can alert the user to the hyperlink. *Id.* at 696–97. Courts have found that simply underlining hyperlinked text is often insufficient to provide notice of a link unless some other design element draws the user's attention to it. *See Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849,

9

857 (9th Cir. 2022) ("Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'"); *but see Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) ("That the links are not blue, underlined, or capitalized does not undercut the district court's conclusion that [defendant] provided [plaintiff] with reasonably conspicuous notice.") (internal quotation marks omitted). Lens.com's hyperlinked text is not set apart in a different color, bold-faced, or capitalized. It is underlined, which alone may be insufficient to draw attention to the text, but the text also changes color from black to red when a cursor hovers over it. The addition of this design element—along with the placement of the hyperlinked text directly below the buttons and away from other text—sufficiently sets the text apart and alerts the user to the Terms of Use.

The font size of the disclosure is smaller than the "Continue" button, but it is not "a font so small that it is barely legible to the naked eye." *Berman*, 30 F.4th at 856–57. The language of the disclosure itself also makes clear that clicking the button means agreement to Lens.com's contractual terms. *See Domer*, 116 F.4th at 697 (disclosure stating "**Please note**:... By submitting your order you accept our Terms of Order" was a clear prompt that provided reasonable notice) (emphasis in original); *Keebaugh v. Warner Bros. Ent. Inc*, 100 F.4th 1005, 1020 (9th Cir. 2024) (notice stating "By tapping 'Play' I agree to the Terms of Service" clearly denoted that continued use constituted acceptance of the terms).

10

A hyperlinked disclosure should be spatially and temporally connected to the required act that manifests assent. *Domer*, 116 F.4th at 698–99. Lens.com's disclosures and hyperlinks to the Terms of Use are directly below the "Continue" and "Go To Checkout" buttons. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292 (2d Cir. 2019) ("The text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appeared directly below, i.e., was 'spatially coupled' with the registration button."); *Oberstein*, 60 F.4th at 517 ("The notices were not buried on the bottom of the webpage or placed outside the action box, but rather were located directly on top of or below each action button."). The disclosure is also temporally connected to the required activity, which means the link to the Terms of Use is on the same page as the "Continue" and "Go To Checkout" buttons. *See Domer*, 116 F.4th at 699; *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (finding the "register" button was "temporally coupled" with terms and conditions because terms were "provided simultaneously to enrollment").

Fitzpatrick argues notice is not conspicuous because the order summary is only visible if the user scrolls below the field for shipping information. She also takes issue with the website design where the Terms of Use are presented "in the middle of the process where no reasonable consumer would believe by hitting the big red 'Continue' button after filling in shipping information, he or she was assenting to the Terms." [9] at 8. A layout that requires the user to scroll a page for information weighs against conspicuous notice. *See Meyer*, 868 F.3d at 78 (taking into account that the "entire screen is visible at once, and the user does not need to scroll beyond what is

immediately visible to find notice of the Terms of Service"). But here, the user can click either button to proceed to the next stage of checkout. The user does not need to scroll down to the order summary to see the hyperlinked Terms of Use. The disclosures and hyperlinks are available in two places on the page rather than only at the bottom of the page. *See Domer*, 116 F.4th at 698 (noting that the words "Terms of Order" appearing twice on a page increased the likelihood that the user saw them).

Lens.com's webpage disclosing the Terms of Use is not "a visually bewildering screen." *Domer*, 116 F.4th at 699. Taken as a whole, the page provided reasonably conspicuous notice of the Terms of Use to Fitzpatrick.

### 2. *Manifestation of assent*

Because Lens.com provided reasonably conspicuous notice of the Terms of Use, Fitzpatrick unambiguously manifested assent to those terms when she clicked the "Continue" or "Go To Checkout" button. *See Domer*, 116 F.4th at 699 ("[T]he Menards notice was reasonably conspicuous, so [plaintiff] manifested her assent to accept the Terms of Order by going through with the purchase."). In contrast to clickwrap agreements where the user affirmatively indicates assent, hybrid agreements do not ask whether the user agrees to the terms or not. But this does not bar a finding that the user manifested assent. Fitzpatrick's assent was not affirmatively indicated, but

it was unambiguous in light of the reasonably conspicuous notice. *Id.* at 700. The forum-selection clause is valid, and Fitzpatrick is bound by it.

## B. Public-Interest Factors

The forum-selection clause that Fitzpatrick agreed to is controlling unless the case is "exceptional." *Atl. Marine*, 571 U.S. at 49. Private-interest factors are inapplicable to this analysis. *Id.* at 63–64. Public-interest factors include:

> administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*IAC/InterActiveCorp v. Roston*, 44 F.4th 635, 645 (7th Cir. 2022). But these factors "rarely outweigh the parties' private interests in enforcing a forum-selection provision." *In re Ryze Claims Sols., LLC*, 968 F.3d 701, 708 (7th Cir. 2020) (internal quotation marks omitted).

The public-interest factors in this case do not "overwhelmingly disfavor a transfer." *Atl. Marine*, 571 U.S. at 67. As the party opposing a valid forum-selection clause, the burden is on Fitzpatrick to make this showing. Fitzpatrick points out that her claim is brought entirely under Illinois law, which Illinois courts are more familiar with than other courts. [9] at 14. Because federal judges routinely apply other state's laws, a court's familiarity with state law does not weigh in favor of denying transfer unless features of the state law are "exceptionally arcane." *Atl. Marine*, 571 U.S. at 67–68. The Illinois Consumer Fraud Act is not exceptionally arcane—the core prohibitions of state consumer protection statutes like the Act are

13

"interpreted for the most part interchangeably." *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). Fitzpatrick points out that the median time from filing to disposition in this district is 5.7 months speedier than in the District of Nevada. A median difference of six months in reaching trial and resolution does not justify denial of transfer. *See In re Ryze Claims Sols.*, 968 F.3d at 710 ("The *forum non conveniens* doctrine should not be used as a solution to court congestion; other remedies, such as placing reasonable limitations on the amount of time each side may have to present evidence, are more appropriate.").

Fitzpatrick also contests Lens.com's argument that judicial resources would be conserved if this case is transferred to Nevada and consolidated with a similar class action pending in *Nail v. Lens.com, et al.*, 2024 WL 4477012 (D. Nev. Oct. 11, 2024). [9] at 15; *see also* [18] and [19] (parties' supplemental briefing). Because this is not a typical § 1404(a) analysis, the burden is not on Lens.com to show judicial resources would be conserved by transfer, and Fitzpatrick's attack on that front doesn't move the public-interest needle.

This case isn't an exceptional one that warrants departing from the parties' selected forum of Nevada. A forum-selection clause is controlling unless (1) the clause is invalid because of "fraud or overreaching," (2) "enforcement would contravene a strong public policy of the forum in which suit is brought," or (3) "the litigant will for all practical purposes be deprived of his day in court." *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 915 (9th Cir. 2019) (cleaned up); *see also In re Ryze Claims Sols.*, 968 F.3d at 711. Fitzpatrick does not contend that the forum-selection

14

clause was the product of fraud or overreaching. She would not be deprived of her day in court if the clause is enforced and the case is transferred to Nevada. And there's no strong public policy of Illinois identified by the parties that would be contravened by enforcing the clause.

Because no exceptional circumstances apply, the forum-selection clause is controlling, and transfer is appropriate.

## IV. Conclusion

Defendant's motion to transfer venue, [5], is granted. The Clerk shall transfer this case to the United States District Court for the District of Nevada.

ENTER:

Manish S. Shah
United States District Judge

Date: October 23, 2024

15

# Exhibit D

Filing # 192444035 E-Filed 02/21/2024 03:22:40 PM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA**

**GENERAL JURISDICTION DIVISION**

CASE NO: _____

RICKEY MARTIN, on behalf of
himself and others similarly-
situated,

     **Plaintiff,**

v.                         **CLASS ALLEGATIONS**

LENS.COM, INC.

     **Defendant.**

_____/

## CLASS ACTION COMPLAINT

Plaintiff RICKEY MARTIN ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this Class Action against Defendant, Lens.com, Inc. ("Defendant"), for unlawful, unfair, and deceptive business practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. § 501.201, *et seq*., among other claims. Plaintiff, by and through his counsel, complains and alleges upon information and belief based upon, among other things, the investigation made by Plaintiff and through his attorneys, as follows:

### NATURE OF THE CASE

1.     This case exposes Defendant's unfair and deceptive practices, where it deliberately misled Plaintiff and the putative class of Florida consumers by imposing a fee under a guise suggesting one purpose, while in reality, it served an undisclosed and entirely different purpose at the point of sale.

2.    This proposed consumer class action seeks all legal and equitable relief available from Defendant arising from its false, misleading, unfair, and deceptive conduct in charging a deceptive and misleading fee to Plaintiff and the putative class of Florida consumers who purchased corrective contact lenses through Defendant's website (https://www.lens.com/). At online checkout, Defendant charges the consumer an additional line-item amount for a charge it labels "Taxes & Fees," which can increase the amount consumers pay for contact lenses by nearly 50%. However, the State of Florida exempts prescription contact lenses from sales tax. Thus, Defendant wrongfully charges consumers for a tax they do not owe. Even worse, the charge labeled as "Taxes & Fees" entirely consists of a "Processing" fee, which is excessive and unrelated to the actual costs of processing the purchase order. The existence of the "Processing" fee is only revealed to consumers if they specifically request a "Full receipt" from Defendant's customer service, and only _after_ the transaction has been completed. Misleading Florida customers into thinking they are being charged taxes, while actually charging them a 100% "Processing" fee, constitutes unfair and deceptive practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and justifies other legal and equitable relief.

3.    As a result of Defendant's conduct, Plaintiff and the proposed class have suffered damages. Lured by Defendant's misleadingly low lens prices, Plaintiff and Florida consumers were coerced into paying fees they would not have paid had the true, deceitful nature of those charges been transparently disclosed. This deceptive practice has persisted for years, defrauding Florida consumers out of hundreds of thousands of dollars. Defendant must be prohibited from further exploiting and profiting from the misleading of consumers like the Plaintiff and the putative class.

2

## PARTIES

4.     Plaintiff Rickey Martin is and, at all times relevant hereto, was a citizen residing in Sunrise, Broward County, Florida. Plaintiff purchased contact lenses from Defendant's website while located in Broward County, Florida and had them delivered to his residence in this county.

5.     Defendant, Lens.com, Inc., is a corporation organized and existing under the laws of the State of Nevada with its headquarters located at 4730 S. Fort Apache Rd Suite 300, Las Vegas, Nevada 89147-7947. On information and belief, Defendant created and/or authorized the false, misleading, and deceptive conduct complained of herein. Moreover, Defendant, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of Florida.

## JURISDICTION AND VENUE

6.     This court has jurisdiction over this matter because all the actions complained of herein occurred in Broward County, Florida and the Defendant has and does conduct business in this county.

7.     This Court has personal jurisdiction over Defendant because Defendant intentionally avails itself of the markets within this county by advertising, selling, and delivering its products to residents of this county through e-commerce channels. Defendant has such minimum contacts with this county that, under the circumstances, it would be fair and reasonable to require Defendant to come to this county and defend this action.

8.     Venue is proper in this Court because Defendant intentionally avails itself of the markets within this state and county so as to render the exercise of jurisdiction by this Court just and proper. Plaintiff purchased products from Defendant while present in this county and had

3

them delivered here; thus, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this county.

9.     Plaintiff makes no claims under federal law. Additionally, no individual claim of the named Plaintiff or any putative class member exceeds $74,999.00; and upon information and belief, the total amount in controversy for the entire putative class is less than $5,000,000.

## COMMON FACTUAL ALLEGATIONS

10.     Defendant sells corrective contact lenses online through its website. To attract consumers to its website, Defendant distributes advertisements on Google and other online search engines prominently advertising its prices for contact lenses.

11.     Defendant advertises artificially low prices for its contact lenses that lure consumers to its website. Defendant then gouges consumers with a misleading added fee, which oftentimes raises the actual price Defendant charges for contact lenses almost 50% over the price it advertises. The deception occurs after the consumer selects their products for purchase, fills in their prescription, doctor, and account information, completes the process to obtain a rebate from Defendant, and arrives at their online "Shopping Cart." An example is shown below:



12.     When a consumer clicks on the "Go To Checkout" box on this screen, they are presented with a page prompting them to either sign into their account or provide their shipping information. The below picture is a true and accurate representation of what a consumer would see on a normal computer using a normal web browser when he or she arrived at this web page:



(without scrolling down on the page).

13.     If the consumer enters their shipping information and clicks "Continue," the consumer will move on to a page asking for payment information. This page is designed deceptively in that the typical consumer will fill in the information required and click "Continue" to proceed with the order process. Defendant designed the page in such a way that a typical consumer would not scroll down and see the "Order Summary," otherwise it would not place "Continue" link in a position where the "Order Summary" is not seen. However, if the consumer scrolls down this page before clicking "Continue," the consumer will be presented with an "Order Summary" as shown below:



14.     In the above Order Summary, the consumer is shown a per box price that matches the advertised price, but the order summary also shows that: (1) the consumer will be charged a "Subtotal" amount of almost 50% more than the advertised price and will only net the advertised price after completing a mail-in rebate; and (2) the consumer will be charged a vague line-item for "Taxes & Fees" that dramatically increases the amount the consumer will pay, even after the mail-in rebate.

15.     If the consumer scrolls down past the "Continue" button and notices the revised order summary and notices the "Taxes & Fees" line-item, the consumer can click on an *i*-link button that purportedly will provide them additional information as to what the "Taxes & Fees" entail. The *i*-link button tells the consumer that "Taxes are tax recovery charges for tax obligations where applicable and the fees are compensation for servicing your order." The disclosure is misleading, unfair, and deceptive because, in truth, the State of Florida does not impose a sales tax on the purchase prescription contact lenses. The charge labeled as "Taxes & Fees" is entirely a "Processing" fee, which Defendant only disclosed when a customer requests and receives a "Full Receipt" from the Defendant's customer service, and that too <u>after</u> the sale

and payment have been finalized.

16.     If the consumer presses "Continue" to move on the following page, the consumer is presented with a form to complete their payment information, as well as a second version of an Order Summary, as shown on the screen below. This Order Summary has the same "Order Total" and "Total After Rebate" numbers as the previous version that the consumer would only see if they scrolled down past the "Continue" button but does not separately identify the "Taxes & Fees" that Defendant is adding onto the order.



17.     Whether or not consumers only review this Order Summary screen, rather than the previous one that breaks out the "Taxes & Fees" line-item separately, the charge almost doubles the amount the consumer should be paying based on the advertised prices. This amount

greatly exceeds any reasonable tax owed on the purchase (which is $0), and Defendant does not attempt to clarify which taxes or fees are included in this cost. The reason is that this amount does not actually correspond to a tax on the purchased lenses or a charge for any given service. Instead, it is a fabricated expense Defendant adds to inflate the price. Unfortunately, consumers remain unaware of this deceit at the point of sale.

18.     Defendant therefore misleads even those consumers who click on the "Taxes and Fees" *i*-link by representing the fee it charges is related to taxes and the costs of servicing Plaintiff's and the putative classes' order. In fact, Defendant never discloses to purchasers that the fee it assesses upon purchase is purely a profit generator. These material facts were not disclosed to Plaintiff or the putative class.

19.     Furthermore, even if Defendant disclosed to Plaintiff and the putative class the fact that the "Taxes & Fees" charge is entirely a "Processing" fee at the point of sale (which it does not), the fee is still unfair and deceptive. Defendant's "Processing" fee does not relate to the actual operational costs associated with processing the order. And even if it were somehow related to these costs, it is excessive, as the amount collected as a "Processing" fee far outweighs the actual costs of processing the order. These material facts were not disclosed to Plaintiff or the putative class.

## PLAINTIFF RICKEY MARTIN

20.     On January 6, 2021, Plaintiff found contacts for purchase at the Defendant's website and went through the extensive order process as described, *supra*. He placed Order Number #: 1895146291 consisting of 4 boxes of contacts at a price of $79.96. After placing the Order, Plaintiff received a receipt showing an un-itemized "Subtotal" of $92.71 plus a $7.95 shipping charge for a "Total" of $100.66. Plaintiff paid the "Total" of $100.66. Clicking the *i*-

link "Subtotal" button reveals that the $92.71 "Subtotal" contained a separate line-item charge of $12.75 for "Taxes & Fees."

21.    On March 19, 2021, Plaintiff placed Order Number #: 1694007434 consisting of 8 boxes of contacts at a price of $159.92. After placing the Order, Plaintiff received a receipt showing an un-itemized "Subtotal" of $185.43 plus a $7.95 shipping charge for a "Total" of $193.38. Plaintiff paid the "Total" of $193.38. Clicking the *i*-link "Subtotal" button reveals that the $185.43 "Subtotal" contained a $25.51 charge for "Taxes & Fees."

22.    On May 23, 2021, Plaintiff placed Order Number #: 1927595869 consisting of 4 boxes of contacts at a price of $143.56. After placing the Order, Plaintiff received a receipt showing an un-itemized "Subtotal" of $183.52 plus a $7.95 shipping charge for a "Total" of $191.47. Plaintiff paid the "Total" of $191.47. Clicking the *i*-link "Subtotal" button reveals that the $183.52 "Subtotal" contained a $39.96 charge for "Taxes & Fees."

23.    On August 10, 2021, Plaintiff placed Order Number #: 1826235164 consisting of 4 boxes of contacts at a price of $151.96. After placing the Order, Plaintiff received a receipt showing an un-itemized "Subtotal" of $191.92 plus a $7.95 shipping charge for a "Total" of $199.87. Plaintiff paid the "Total" of $199.87. Clicking the *i*-link "Subtotal" button reveals that the $151.96 "Subtotal" contained a $39.96 charge for "Taxes & Fees."

24.    On October 26, 2021, Plaintiff placed Order Number #: 1214916529 consisting of 4 boxes of contacts and solution at a price of $172.93. After placing the Order, Plaintiff received a receipt showing an un-itemized "Subtotal" of $212.89 plus a $7.95 shipping charge for a "Total" of $220.84. Plaintiff paid the "Total" of $220.84. Clicking the *i*-link "Subtotal" button reveals that the $212.89 "Subtotal" contained a $39.96 charge for "Taxes & Fees."

25.    The Plaintiff was misled into paying the charge labeled "Taxes & Fees" for all the

aforementioned transactions. In reality, this charge was entirely a "Processing" fee. The existence of this fee is only disclosed to Plaintiff and consumers after the completion of the transaction, when Defendant emails a "Full Receipt." At the point of purchase, neither the Plaintiff nor any potential class members had any way of knowing that the "Taxes & Fees" charge was not as it was represented.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action on behalf of himself and a Class of similarly situated persons as follows:

> All Florida residents and consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased products from Defendant and paid a charge labeled "Taxes & Fees" (known to Defendant as a "Processing" fee).

27.     Excluded from the Class are Defendant, any entities in which it has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, any person in bankruptcy, and the presiding judge(s) in this case and its staff.

28.     Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

29.     **Numerosity**: At this time, Plaintiff does not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiff believes that the number of Class members is in excess of forty and into the thousands, and thus are so numerous that joinder of all members is impractical. The number and identities of Class members is

administratively feasible and can be determined through appropriate discovery in the possession of Defendant.

30. **Commonality**: There are questions of law or fact common to the Class, which include, but are not limited to the following:

a. Whether Defendant's alleged misconduct deceived or had the tendency to deceive consumers;

b. Whether Defendant's alleged conduct constitutes violations of the laws asserted;

c. Whether the "Taxes & Fees" charge is deceptive and unfair when Plaintiff and the putative class were not charged any taxes on the products they purchased;

d. Whether the "Taxes & Fees" charge is deceptive and unfair when it was in actuality a 100% "Processing" fee;

e. Whether the "Processing" fee is deceptive and unfair as it was excessive and not related to the actual costs of processing the purchase orders.

f. Whether Plaintiff and members of the Class were harmed by Defendant's unfair, unlawful, deceptive, and misleading conduct;

g. Whether Defendant breached its contract with Plaintiff and the putative class by charging the deceptive, unfair and fraudulent fee at issue;

h. Whether Plaintiff and the putative class were harmed by Defendant's breach of contract;

i. Whether Defendant was unjustly enriched by charging Plaintiff and the putative class the deceptive, unfair and fraudulent fee at issue;

j. Whether Plaintiff and the putative class were harmed by Defendant's unjust enrichment; and

k. Whether an injunction is necessary to prevent Defendant from continuing to deceptively charge the fee at issue.

31. **Typicality**: Like Plaintiff, many other consumers ordered products from Defendant's website based on Defendant's deceptive advertisements. Plaintiff's claims are typical of the claims of the Class because Plaintiff and each Class member were injured by

Defendant's false and/or misleading advertising. Plaintiff and the Class have suffered the same or similar injury as a result of Defendant's false, deceptive, and misleading representations. Therefore, Plaintiff's claims are typical of the claims of the Class and class treatment is appropriate.

32.      **Adequacy of Representation**: Plaintiff is committed to pursuing this action and has retained competent counsel who is experienced in prosecuting and resolving consumer class actions. Plaintiff will fairly and adequately represent the interests of the Class and does not have any interests adverse to those of the Class.

33.      **Superiority**: The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote because the damages or other financial detriment suffered by individual Class Members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against Defendant.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT ONE**</u>
<u>**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF UNDER**</u>
<u>**THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**</u>
<u>**FLA. STAT. § 501.201, *et seq.***</u>

34.      Plaintiff adopts and re-alleges all paragraphs in this Complaint as if fully set forth herein.

35.      The Florida Deceptive and Unfair Trade Practices Act (FDUTPA), FLA. STAT. § 501.201, *et seq.* prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

36. The purpose of FDUTPA is "to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202.

37. Plaintiff is a "consumer" as defined by § 501.203(7). At all times relevant hereto, Defendant has engaged in "trade or commerce" under § 501.203(8) and is subject to the duties and liabilities imposed under FDUTPA.

38. Pursuant to FLA. STAT. § 501.211(1), anyone aggrieved by a violation of FDUTPA may bring an action to obtain a declaratory judgment that an act or practice violates FDUTPA and to enjoin such person who has violated, is violating, or is otherwise likely to violate FDUTPA.

39. Pursuant to FLA. STAT. § 501.211(2), any person who has suffered a loss because of a violation of FDUTPA may bring an action for actual damages, attorney's fees, and court costs.

40. Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of its trade and commerce by:

(a) charging a fee Defendant labeled "Taxes & Fees", thereby suggesting some portion of the fee was for taxes, when Plaintiff did not owe any tax;

(b) charging a fee Defendant labeled "Taxes & Fees" when in truth it was a 100% "Processing" fee;

(c) charging what was ultimately a 100% "Processing" fee, but labeling it a charge for "Taxes & Fees" at the point of sale completion;

(d) failing to disclose to Plaintiff that the "Taxes & Fees" charge was entirely a "Processing" fee;

(e) Failing to disclose from Plaintiff that he did not owe any taxes on the purchase of prescription contact lenses;

13

(f) designing the online checkout process to prevent Plaintiff and consumers from seeing that their Order "Subtotal" contained a line-item charge for "Taxes & Fees;"

(f) charging a "Processing" fee that does not relate to the actual operational costs associated with processing the order;

(g) charging an excessive amount for the "Processing" fee, because the amount collected far outweighed the actual costs of processing the order; and

(h) failing to disclose to Plaintiff that the "Processing" fee was excessive and/or did not relate to the actual operational costs associated with processing the order

41.    Defendant's unfair and deceptive acts and practices as described herein have caused Plaintiff to suffer actual damages including, but not limited to, payment of the fee at issue at the times set out above.

42.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff has been damaged by Defendant's conduct and is entitled to relief under FDUTPA including, but not limited to, actual damages, an injunction, attorney's fees, and costs.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendant for all remedies and damages available, including a declaration that Defendant's practices described above are deceptive or unfair trade practices under FDUTPA, actual damages, restitution, injunctive relief preventing Defendant from continuing to violate FDUTPA, interest, and attorney's fees and costs incurred in bringing this action pursuant to FLA. STAT. § 501.201. Plaintiff, on behalf of the putative class, seeks recovery related only to the fees paid and does not seek a refund of the entire purchase price for each purchase transaction.

## COUNT TWO
## BREACH OF CONTRACT

43.    Plaintiff adopts and re-alleges all paragraphs in this Complaint as if fully set forth herein.

44.    To the extent this cause of action contradicts or conflicts with any other claim, it is pled in the alternative.

45.    The purchase transactions set out above constitute a valid and binding contract between Plaintiff and Defendant.

46.    A material term of the contract required Plaintiff to pay for a line-item charge labeled "Taxes & Fees" in each transaction. Plaintiff paid the charges.

47.    Moreover, the purchase contracts imposed an implied term of good faith and fair dealing on Defendant.

48.    Defendant breached the aforementioned contract terms by charging Plaintiff for "Taxes & Fees" when Plaintiff did not owe any taxes in the first place, by charging Plaintiff for "Taxes & Fees" when the fee was entirely a "Processing" fee, and by charging a "Processing" fee that was excessive and/or had no relation to the actual costs of processing or servicing the online orders.

49.    As a proximate result of Defendant's breach, Plaintiff suffered actual damages by paying the "Taxes & Fees" (known internally by Defendant as "Processing" fees) as set out above.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendant for all remedies and damages available under the law. Plaintiff, on behalf of the putative class, seeks recovery related only to the fees paid and does not seek a refund of the entire purchase price for each purchase transaction.

## COUNT THREE
## UNJUST ENRICHMENT

50.    Plaintiff adopts and re-alleges all paragraphs in this Complaint as if fully set forth herein.

15

51.     To the extent this cause of action contradicts or conflicts with any other claim, it is pled in the alternative.

52.     By paying the "Taxes & Fees" (known internally by Defendant as "Processing" fees) as set out above, Plaintiff conferred a benefit on Defendant.

53.     Defendant had knowledge of the benefit conferred.

54.     Defendant voluntarily accepted and retained the conferred benefit.

55.     Because of the deceptive, unfair, and misleading nature of the fees, as set out above, the circumstances are such that it would be inequitable for Defendant to retain the benefit conferred without paying Plaintiff the value of that benefit.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendant for all remedies and relief available under equity, including restitution. Plaintiff, on behalf of the putative class, seeks recovery related only to the fees paid and does not seek a refund of the entire purchase price for each purchase transaction.

## PRAYER FOR RELIEF

56.     Plaintiff, on behalf of himself and the Class, requests the following relief:

(a) An order certifying the Class and appointing Plaintiff as the representative for the Class;

(b) An order certifying the undersigned counsel as Class counsel;

(c) Restitution for Plaintiff and the Class members of the subject fees paid (This amount includes payments only for "Taxes & Fees" and/or "Processing" fee, and Plaintiff and the putative class do not seek a refund of the entire purchase price for each purchase transaction);

(d) Judgment for actual damages;

(e) Pre- and post-judgment interest on the amount recovered;

(f) Attorney's fees and costs of this action; and

16

(g) For such other and further relief as may be just and proper, including but not limited to a preliminary and/or permanent order enjoining Defendant from engaging in the unlawful and unfair acts and practices described herein.

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS.**

  s/ J. Matthew Stephens
J. Matthew Stephens
Florida Bar No. 0688649
**METHVIN, TERRELL, YANCEY,
STEPHENS & MILLER, P.C.**
2201 Arlington Avenue South
Birmingham, Alabama 35205
Telephone: (205) 939-0199
Facsimile: (205) 939-0399
Email: mstephens@mtattorneys.com

*Attorney for Plaintiff and Putative Class*

Matthew Herman, Esq.
**MEYERS & FLOWERS, LLC**
3 N. 2nd Street, Suite 300
St. Charles, IL 60174
mh@meyers-flowers.com
(630) 232-6333 Voice
(630-845-8982) Facsimile

*Pending Pro Hac Vice Admission*

**LENS.COM, INC. MAY BE SERVED AT THE FOLLOWING ADDRESS:**

Lens.com, Inc.
c/o Nevada Corporate Headquarters, Inc.
4730 S. Fort Apache Rd, Suite 300
Las Vegas, NV 89147-7947

# Exhibit D-1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:24-cv-60489-LEIBOWITZ

**RICKEY MARTIN,** *on behalf of himself and others similarly situated,*

      *Plaintiff,*

*v.*

**LENS.COM, INC.,**

      *Defendant.*

_____/

## <u>MEMORANDUM OPINION AND OMNIBUS ORDER</u>

When you buy something online, and you click the buttons to set up and consummate the transaction, what exactly are you agreeing to? Every term and condition contained within any hyperlink on the screen? Does it matter what color the buttons are, how large the font is, or when you click certain buttons? What if the hyperlinks with all the terms are above the buttons? What if they are below them? Does it matter what the actual terms are, or if you click on the links and look at the terms or not? With more than $1 trillion in online transactions executed by Americans in 2023,[1] our law sets out clear, bright-line answers to most of this by now, right? Spoiler alert: Not so much.

These questions arise from three pending motions before the Court: (1) Defendant's Motion to Change Venue [ECF No. 17]; (2) Defendant's Motion to Dismiss [ECF No. 18]; and (3) Plaintiff's Motion to Strike [ECF No. 46] (collectively "the Motions"). On October 25, 2024, the Court held a hearing on the enforceability of a forum-selection clause embedded within a hyperlink, upon which

---

[1]    John Koetsier, *E-Commerce Retail Just Passed $1 Trillion For The First Time Ever,* Forbes Magazine (Feb. 2, 2023, 11:43 AM Eastern), http://www.forbes.com/sites/johnkoetsier/2023/01/28/e-commerce-retail-just-passed-1-trillion-for-the-first-time-ever (last visited Nov, 18, 2024).

Defendant moves to dismiss and transfer this Florida-filed case to Nevada.  [*SEE PAPERLESS MINUTE ENTRY*, ECF No. 48].  After due consideration of the Motions, the parties' papers and arguments, the record, and the relevant law, the Court GRANTS IN PART and DENIES IN PART Defendant's Motions to Change Venue and Dismiss [ECF Nos. 17, 18].  Plaintiff's common law claims for breach of contract (Count II) and unjust enrichment (Count III) are TRANSFERRED to the United States District Court for the District of Nevada, pursuant to 28 U.S.C. § 1404(a).  However, this Court retains jurisdiction over Plaintiff's claim brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.201, *et seq.*  (Count I).  Finally, and in light of the other rulings, the Court DENIES Plaintiff's Motion to Strike [ECF No. 46] as MOOT.

## I.      FACTUAL BACKGROUND

Plaintiff Rickey Martin (not the "Livin' la Vida Loca" singer-songwriter) is a Florida resident who purchased corrective contact lenses from Defendant Lens.com's website on five separate occasions between January and October, 2021.  [Complaint, ECF No. 1-1 ¶¶ 20–24].  When making these online purchases, Martin alleges that Lens.com charged him an undisclosed, unreasonable, and unlawful processing fee in violation of the FDUPTA.  [*Id.* ¶ 25].  Martin further alleges that Lens.com advertised one price for its contact lenses but charged 50% more than the advertised price at checkout (*see* "Subtotal" in the graphic below).  [*Id.* ¶ 14].  According to Martin, purchasers can only recoup the additional 50% charge by completing a mail-in rebate which is disclosed at checkout for the first time. [*Id.*].  The following is a screen snapshot that helps illustrate Martin's claim.



Martin also alleges that Lens.com charged Florida customers "Taxes and Fees," even though the State of Florida exempts contact lens purchases from sales tax. [*Id.* ¶ 2]. Martin claims that the "Taxes and Fees" are unlawfully deceptive because the charge is "entirely a 'Processing' fee, which Defendant only disclose[s] when a customer requests and receives a 'Full Receipt' from the Defendant's customer service, … <u>after</u> the sale and payment have been finalized." [*Id.* ¶ 15]. From all this, Martin seeks to represent a class of "[a]ll Florida residents and consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased products from Defendant and paid a charge labeled "Taxes & Fees" (known to Defendant as a "Processing" fee)." [ECF No. 1-1 ¶ 26]. Martin wants the trial of this matter to occur here in South Florida.

Not so fast, says Lens.com: By clicking certain buttons in these transactions, Martin agreed

that any dispute like this would be handled in Nevada and governed by Nevada law—not in Florida. Lens.com moves to transfer this case to Nevada pursuant to that forum-selection clause it says Plaintiff agreed to when he purchased the contact lenses online. A hyperlink to Defendant's Terms of Use containing the forum-selection clause appears twice during Defendant's online purchase process. First, the Terms of Use hyperlink appears on the Shipping Information page, as follows:



[ECF No. 17 at 8].

The "Continue" button on the Shipping Information page is a large red rectangle with large white text at the bottom center of the page. [*Id.*]. Below the "Continue" button is a notice of acquiescence in smaller black text that reads: "By continuing you agree to our Terms of Use & Privacy Policy." (This part of the page is reproduced below.)

**Continue**

By continuing you agree to our Terms of Use & Privacy Policy

The underlined text in the notice of acquiescence below the "Continue" button is hyperlinked such that the text color changes from black to red when your cursor hovers over it.  *See* Declaration of Tim Jaeck ("Jaeck Decl.") [ECF No. 17-1 ¶ 11].   Clicking on the Terms of Use hyperlink launches the Terms of Use page.  [*Id.* ¶ 12].  The Terms of Use state, in relevant part:

> These Terms and Conditions of Use shall be governed by and construed in accordance with the laws of the State of Nevada, without regard to choice of law rules. Any litigation arising out of or in connection with the use of this site shall be exclusively venued in state or federal courts located in Clark County, Nevada….

[ECF No. 17 at 6–7].  A customer can scroll past the "Continue" button without clicking it.[2]  If the customer scrolls down to the bottom of the Shipping Information page, the Order Summary displays. This is the second location where the Terms of Use hyperlink appears.  The Terms of Use hyperlink this time appears below the "Go To Checkout" button.  Jaeck Decl. [ECF No. 17-1 at 17].  Here's the illustration of that:



---

[2]    If the customer clicks on the "Continue" button, a purchase order form displays where the customer can enter their payment information.  [*See* Compl., ECF No. 1-1 ¶ 16].

The "Go to Checkout" button (like the "Continue" button) is a large red rectangle with large white text. *Id.* The Terms of Use hyperlink appears below the "Go To Checkout" button in smaller, underlined black text. Directly below the "Go To Checkout" button is the same notice of acquiescence described above: "By continuing you agree to our Terms of Use & Privacy Policy." (Reproduced and magnified immediately below.)



Once again, the customer is not required to click the Terms of Use hyperlink or otherwise specifically agree to the terms. The customer can simply click "Go To Checkout" to continue the transaction process.

## II.     PROCEDURAL BACKGROUND

On February 21, 2024, Martin filed his Class Action Complaint in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida, asserting a FDUPTA claim (Count I) [ECF No. 1-1 ¶¶ 34–42]; a breach of contract claim (Count II) [*id.* ¶¶ 43–49]; and a claim for unjust enrichment (Count III) [*id.* ¶¶ 50–55]. For relief, Martin seeks a declaration that Lens.com's practices constitute deceptive or unfair trade practices under the FDUPTA, as well as actual damages, restitution, injunctive relief, interest, attorney's fees and costs. [*See id.* at 14].

Lens.com removed the case on March 27, 2024, invoking this Court's original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). [ECF No. 1 ¶¶ 20–29]. "CAFA permits the removal of class actions to federal court where the putative class action includes 100 or more members, at least one plaintiff is diverse from one defendant, and the aggregate amount in controversy exceeds $5 million." *Anderson v. Wilco Life Ins. Co.,* 943 F.3d 917, 924–25 (11th Cir. 2019)

(citing 28 U.S.C. §§ 1332(d), 1453). Lens.com's Notice of Removal clearly meets the statutory requirements for removal under the CAFA. First, the putative class exceeds 100 members in that Lens.com sold its products to 15,000 consumers in Florida in 2023 alone. [ECF No. 1 ¶ 29]. Second, the putative class of Florida consumers are diverse in citizenship from Lens.com, a Nevada corporation. [*Id.* ¶¶ 21–22]. And third, the aggregate amount in controversy exceeds five million dollars based on Defendant's estimate that Florida consumers paid more than $5,000,000 in "Taxes and Fees" between 2020 and 2024. [*Id.* ¶ 24].

Shortly after removal, Lens.com moved to dismiss and transfer this action to Nevada pursuant to the forum-selection clause discussed above. The Motions are now fully briefed, supplemented, and ripe for review. [*See* ECF Nos. 17, 18, 22, 23, 25, 26, 30, 31, 34, 35, 44, 45, 47]. This Court conducted two hearings on the Motion to transfer. The first was held on August 28, 2024. [*See* ECF No. 32]. The second was held on October 25, 2024 [*see* ECF No. 48], after the parties engaged in limited discovery on the enforceability of the forum-selection clause. [ECF No. 37].

## III.   DISCUSSION

Lens.com's forum-selection clause is found in what some cases call a "hybrid-wrap" agreement. Some courts have recognized and discussed three variations of online electronic agreement formats: clickwrap, browsewrap, and hybrid-wrap. *See, e.g., Domer v. Menard, Inc.,* 116 F.4th 686, 694–95 (7th Cir. 2024). Clickwrap agreements require the user's affirmative assent to the terms of the agreement, and they are typically enforced. *Id.* (citation omitted). Browsewrap agreements "provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions." *Id.* (citation omitted). These agreements are typically not enforced. *Id.* at 695. Hybrid-wrap agreements fall somewhere between the two.

Hybrid-wrap agreements "merely present the user with a hyperlink to their terms and conditions," *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019), *aff'd* 815 F. App'x

612 (2d Cir. 2020), and display some form of "notice of deemed acquiescence," *Domer*, 116 F.4th at 695. Under this type of agreement format, "an offeree does not have actual notice of certain contract terms, [but] he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). A user is put on "inquiry notice" if the "design and content" of the webpage renders "existence" of those terms "reasonably conspicuous." *Nicosia*, 834 F.3d at 233. Because assent to a hybrid-wrap agreement is "passive," these agreements are enforced "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Domer*, 116 F. 4th at 695 (citations omitted).

In the case at hand, the text below the action buttons informs consumers that they "agree to" Defendant's Terms of Use by clicking the "Continue" or "Go To Checkout" buttons-- a notice of deemed acquiescence. Within the "notice of deemed acquiescence" is a hyperlink to the Terms of Use where the forum-selection clause lies. To determine whether the forum-selection clause is enforceable, the Court must first determine whether Defendant's Terms of Use hyperlink is sufficiently conspicuous to put a prudent internet user on inquiry notice. If so, the Court must then decide whether a user's clicking the "Continue" or "Go To Checkout" button unambiguously manifests the user's consent to the agreement terms.

### A.     Enforceability of the Forum-Selection Clause.[3]

---

[3]      Plaintiff contact lens purchasers have filed five class action lawsuits in various Districts across the nation for conduct similar to that alleged in the Complaint. *See Franks v. Lens.com, Inc.,* No. 2:24-cv-00724 (D. Nev.); *Fitzpatrick v. Lens.com, Inc.,* No. 1:24-cv-02700 (N.D. Ill.); *Nail v. Lens.com, Inc.* No. 2:24-cv-02531 (C.D. Cal.); and *Gonneville v. Lens.com, Inc.,* No. 1:24-cv-11110 (D. Mass). Two District Courts— one in Central California and the other in Northern Illinois— recently enforced the subject forum-selection clause and transferred their cases to Nevada. *See Fitzpatrick v. Lens.com, Inc.,* No. 1:24-cv-02700 (N.D. Ill. Oct. 23, 2024); *Nail v. Lens.com, Inc.* No. 2:24-cv-02531 (C.D. Cal. June 20, 2024).

1.  <u>The Terms of Use hyperlink is sufficiently conspicuous.</u>

Plaintiff contends that the Terms of Use hyperlink is not conspicuous because (1) the font size is significantly smaller than the text of the action buttons; (2) the text color is black (not the traditional blue used for hyperlinks); (3) the hyperlink is placed below (rather than above) the action buttons; and (4) the hyperlink appears only on the Shipping Information page (albeit twice).  [ECF No. 23 at 13–18].  Defendant counters that the Terms of Use hyperlink is sufficiently conspicuous because (1) the black text is set against a white background; (2) the hyperlink text is underlined; (3) the hyperlink text turns red when a mouse hovers over it; (4) the font size is readable; and (5) the language is simple— "By continuing you agree to our <u>Terms of Use</u> & <u>Privacy Policy</u>."  [ECF No. 26 at 7].

In Florida, absent actual knowledge, a "reasonably prudent internet user" must be put on "inquiry notice" before an internet agreement will be enforced.  *See Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1260 (S.D. Fla. 2021); *IT Strategies Group, Inc. v. Allday Consulting Group, L.L.C.*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013).  In deciding whether a user was put on inquiry notice, "courts evaluate the conspicuousness and placement of the hyperlink as well as whether the site provided notice that a specific action would demonstrate acceptance of those terms."  *See Goldstein v. Fandago Media, LLC*, No. 9:21-cv-80466-RAR, 2021 WL 6617447, at *2 (S.D. Fla. July 27, 2021) (citing *Bell v. Royal Seas Cruises, Inc.*, No. 19-CV-60752, 2020 WL 5742189, at *6 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (holding that the "conspicuousness and placement" of the

---

These judges found the forum-selection clause enforceable, relying on case law holding that hybrid-wrap agreements are enforceable only if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *See Domer*, 116 F.4th at 694–95 (citation omitted).  Applying that two-part test, the *Nail* and *Fitzpatrick* courts determined that Defendant's Terms of Use hyperlink was conspicuous, and that Plaintiff's clicking the "Continue" button manifested assent to the forum-selection clause.  After careful review of both opinions, this Court agrees with their reasoning and rulings.

hyperlink and "the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement")).

Although not binding, courts consider the following factors when making conspicuousness determinations: "color, size, positioning, language, and design of the hyperlink and its accompanying text." *Tejon v. Zeus Networks, LLC*, No. 24-cv-20498-PCH, 2024 WL 1293757, at *2 (S.D. Fla. Mar. 26, 2024) (citations omitted). Applying all these factors, this is where the bright lines start to dim and judicial balancing starts to look more like Justice Stewart's famous definition of obscenity:[4] The combination of font color, font size, relative positioning, specific language, and overall design of Lens.com's Terms of Use hyperlink puts a prudent internet user on "inquiry notice."

Here, although the font color and font size of the hyperlink and notice of acquiescence do not "shout out" for attention, the font color and font size used do not bury or obscure the text (because I know it when I see it!). While the large red action buttons certainly attract the user's attention, the hyperlinks and text immediately below the buttons are visible and readable.[5] Moreover, the notice "By continuing you agree to our Terms of Use & Privacy Policy" is in black font set against a white background with sufficient space above and beneath the text to make the notice stand out. The additional feature that the underlined hyperlink's text color changes from black to red when the cursor hovers over it tends toward conspicuousness and away from obscurity.

---

[4]     *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description ["hard-core pornography"], and perhaps I could never succeed in intelligibly doing so. But *I know it when I see it*, and the motion picture involved in this case is not that.") (emphasis added).

[5]     Although formal judicial notice is not always taken in these kinds of cases and disputes, in virtually any current online transaction the actual font size of the characters, as well as their relative position to each other, is within the significant control of the consumer. Therefore, the very act of processing and completing the entire online transaction, in the absence of obvious and unusual placement of certain terms on the website, carries with it the reasonable inference that either the consumer was aware of the possibility of additional terms and conditions or the affirmative decision to transact without inquiring about them.

Contrary to Martin's contention, the cases he relies on do not create a bright-line rule such that a hyperlink to contract terms is deemed inconspicuous solely because it is positioned below an action button. Indeed, each of the cases Martin cites for this proposition is distinguishable.[6] In *Goldstein,* 2021 WL 6617447, and *Tejon,* 2024 WL 1293757, the court considered the enforceability of an arbitration agreement accessible by hyperlink. In those cases, the court determined that inconspicuous placement of the hyperlink coupled with the language used was insufficient to put a reasonable user on notice of the waiver of the right to sue. *Goldstein,* 2021 WL 6617447, at *3–4; *Tejon,* 2024 WL 1293757, at *3–4.

In this case, Defendant seeks to enforce a forum-selection clause that dictates where (not if) Plaintiff may hale Defendant into court. This case is also different from *Goldstein* and *Tejon* because the acquiescence notices there were obscured by their lack of simple phrasing and their lack of stark contrast between the text and background. *See Goldstein,* 2021 WL 6617447, at *1 *Tejon,* 2024 WL 1293757, at *1. Accordingly, the placement of the notices below the action button in *Goldstein* and *Tejon* accentuated the hidden nature of those notices. Here, relatively speaking, the notice "pops" off of the screen.

Having examined all factors (color, size, positioning, language, and overall design of the hyperlink and its accompanying text) in their totality, the Court finds Lens.com's Terms of Use hyperlink sufficiently conspicuous to put a prudent internet user on inquiry notice. Having so found, the Court considers whether Plaintiff unambiguously manifested his consent.

2. Clicking the action button unambiguously manifested Plaintiff's assent.

Martin argues that he should not be bound by the forum-selection clause because he never

---

[6]     *Zamber v. Am. Airlines, Inc.,* No. 15-23901-CV-MARTINEZ/GOODMAN, 2020 WL 1445479, at *3 (S.D. Fla. Feb. 11, 2020) is inapposite because there the court enforced a forum-selection clause which was found in a clickwrap agreement.

saw the Terms of Use hyperlink. [ECF No. 23 at 12]. In essence, Martin contends that there was no

"meeting of the minds." [*Id.*] Lens.com counters that Martin agreed to the forum-selection clause

by clicking an action button where notice was provided immediately below the button. By continuing,

Martin agreed to the Terms of Use which were readily accessible by hyperlink. [ECF No. 26 at 4].

Here, Lens.com has the better of it.

Black-letter law doesn't get more black than this: A binding and enforceable contract requires

"mutual assent to certain and definite contractual terms; without a meeting of the minds on all of the

essential terms, no enforceable contract arises." *In the Matter of T & B General Contracting, Inc.,* 833 F.2d

1455, 1459 (11th Cir. 1987). "While new commerce on the Internet has exposed courts to many new

situations it has not fundamentally changed the principles of contract." *LoanFlight Lending, LLC v.*

*Bankrate, LLC,* 378 So.3d 1280, 1286 (Fla. 2d DCA 2024) (citation omitted).

> Mutual assent remains the touchstone of contract formation. … And mutual assent
> cannot exist where a party does not have reasonable notice that an offer is at hand. In
> other words, reasonable notice of an offer is a necessary precondition to mutual assent.
> And requiring mutual assent ensures consumers know they are entering into an
> agreement.

*Eglin Fed. Credit Union v. Baird,* No. 1D2023-1866, 2024 WL 3956764, at *2 (Fla. 1st DCA Aug. 28,

2024) (internal citation omitted); *See Glosser v. Vasquez,* 898 So.2d 1179, 1181 (Fla. 3d DCA 2005)

("Thus, to create a contract and trigger contractual obligations, the parties must have a definite and

distinct understanding, without which there is no assent and no contract.") (citation omitted).

Florida courts recognize that "notice can come in many forms." *Eglin Fed. Credit Union,* 2024

WL 3956764, at *3 (citing *Hallman v. Carnival Cruise Lines, Inc.,* 459 So. 2d 378, 380–81 (Fla. 3d DCA

1984) (holding a passenger ticket warning passenger of the conditions of the contract was reasonable

because of "the conspicuousness and clarity of notice on the face of the ticket"); *Sgouros v. TransUnion*

*Corp.,* 817 F.3d 1029, 1033–34 (7th Cir. 2016) (explaining that a clickwrap agreement can signify

acceptance of contract if "the layout and language of the site gives the user reasonable notice that a

click will manifest assent to an agreement")). Whether a party received reasonable notice is a fact-intensive inquiry, and for internet transactions "the design and content of the relevant interface" are especially relevant. *Id.* (citation omitted).

In the case at hand, Plaintiff unambiguously manifested his consent to the Terms of Use by clicking "Continue" where clear notice was provided immediately below the "Continue" button that "By continuing you agree to our <u>Terms of Use</u> & <u>Privacy Policy</u>." At that moment, Plaintiff had the opportunity to click on the Terms of Use hyperlink, read the terms— including the forum selection clause— and decline to continue to process the transaction. Even though Plaintiff testified at his deposition that he never saw the hyperlink, actual knowledge is not the test. Indeed, "actual knowledge" has for all practical purposes been replaced with "inquiry notice" as far as manifesting assent to online agreements. *See Bell v. Royal Seas Cruises, Inc.,* No. 19-CV-60752, 2020 WL 5742189, at *7 (S.D. Fla. May 13, 2020), report and recommendation adopted, No. 19-CIV-60752-RAR, 2020 WL 5639947 (S.D. Fla. Sept. 21, 2020) (analyzing the enforceability of an online agreement as to website design and constructive notice in the absence of actual notice); *see also, Domer,* 116 4th at 695 (enforcing hybrid-wrap agreement where assent was not express but "unambiguous in the light of the objectively reasonable notice"); *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.,* 999 F.3d 828, 834 (2d Cir. 2021) ("We have held that, even where the offeree does not have *actual* notice of the contract terms [and conditions on Defendant's website], she will still be bound by such terms if a "reasonably prudent" person would be on *inquiry* notice of those terms and she unambiguously manifested assent to those terms.") (citation omitted).

If Tallahassee or Congress declared some default rules for what constitutes inquiry notice in the realm of online contractual transactions, that would create some brighter lines; but they have not done so. Unless and until they do, this court will not retroactively declare a lack of mutual assent (absent any facts that go beyond a simple declaration of no actual notice), when the common practice

of millions of American purchasers is that they voluntarily bind themselves to terms that favor the seller. The internet's miraculous reduction of transaction costs should not be disturbed so casually. *See generally* Ronald H. Coase, *The Problem of Social Cost*, 3 JOURNAL OF LAW & ECONOMICS 1, 15–28 (1960).

In sum, the Court concludes that Lens.com's hybrid-wrap agreement is enforceable. As a result, the Court will enforce the forum-selection clause against Plaintiff as to his common law claims for breach of contract (Count II) and unjust enrichment (Count III). The Court, however, declines to exercise its discretion to transfer Plaintiff's FDUPTA class claims to Nevada, as explained below.

**B.    FDUPTA Class Claim (Count I).**

By enacting the FDUPTA, the sovereign State of Florida has asserted its clear interest regarding unfair and deceptive business practices—regardless of contract. Plaintiff gives two main reasons why this Court should not transfer his FDUPTA class claims to Nevada. First and foremost, Plaintiff argues that the State of Florida has a strong interest in adjudicating the claims because tens of thousands of Florida consumers were allegedly charged illegal, undisclosed fees in excess of $5,000,000 over a four-year period. [ECF Nos. 1-1; 44]. Second, Plaintiff argues that the FDUPTA claims could disappear after transfer to Nevada in one of three ways: (1) the Nevada judge could require Plaintiff to recast the FDUPTA claims as claims brought under the analogous Nevada statute, which imposes a higher burden of proof and might be the death knell for the class; (2) the Nevada judge could grant Defendant's motion to dismiss the FDUPTA claims; or (3) the claims could be "swallowed up" in the pending nationwide class action filed in the District of Nevada, which was brought after this case was filed. *See Franks v. Lens.com, Inc.,* No. 2:24-cv-00724 (D. Nev.). [ECF No. 44 at 6–8].

Defendant argues that Nevada's higher evidentiary burden for deceptive trade claims is not enough to withstand transfer. Instead, Defendant says Plaintiff must show that "the purpose and

effectiveness of the FDUPTA would be seriously undermined if the claims" were litigated in Nevada. [ECF No. 45 at 2–3 (quoting and distinguishing *America Online, Inc. v. Pasieka,* 870 So.2d 170 (Fla. 2004))]. Because Plaintiff can pursue his class claims in Nevada—unlike the plaintiff in *America Online*—Defendant argues that Plaintiff cannot show harm to the FDUPTA. [*Id.*].

As for Plaintiff's argument that the Nevada court might dismiss Plaintiff's FDUPTA claims, Defendant represented at the October 25 hearing that scenario is unlikely because the Nevada judge presiding over the California case transferred there denied Defendant's motion to dismiss the California trade claims. But, of course, assignment of this case to that same judge is not guaranteed, and in any event the assignment of the case to a specific judge is not a factor this Court considers. What matters is whether proper application of Nevada law would seriously undermine the Florida FDUPTA claim.

After considering the law on this point, it is clear that the FDUPTA class claim should *not* be transferred. First and most fundamentally, the FDUPTA claim is an independent statutory claim completely severable, distinct, and independent of any claims arising from a contract. *See Management Computer Controls, Inc. v. Charles Perry Constr., Inc.,* 743 So.2d 627, 632 (Fla. 1st DCA 1999). So, notwithstanding the Court's ruling on the enforceability of the forum-selection clause (which is a determination made under contract law principles), Plaintiff's statutory tort claim need not, and the Florida legislature and Florida courts have declared should not, travel in lockstep with his contract or quasi-contract law claims.

Second and relatedly, the Court finds the State of Florida has a unique interest in adjudicating Plaintiff's FDUPTA class claim. The FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation." *Millennium Comm. & Fulfillment, Inc. v. Office of the Attorney General,* 761 So.2d 1256, 1262 (Fla. 3d DCA 2000); *In re NationsRent Rental Fee Litig.,* No. 06-60924-CIV, 2009 WL 636188, at *4–5

(S.D. Fla. Feb. 24, 2009). Plaintiff's FDUPTA claims arise from Defendant's allegedly charging "Taxes & Fees" on products that the Florida legislature has deemed tax-exempt. Other state legislatures may have made different tax decisions. But in the Sunshine State, corrective contact lenses are exempt from sales tax as a matter of public policy declared by her elected representatives. Moreover, it is alleged that tens of thousands of Florida consumers have actually paid the illegal "Taxes and Fees" (to the tune of more than $5,000,000 over a four-year period no less). [ECF No. 1 ¶¶ 24, 29].

I have no doubt that a Nevada district judge assigned this case would be well qualified to apply Florida law. That is not the question. Rather, the question regarding transfer is whether Florida's sovereign interest would be "seriously undermined," by application of the law of the transferee state. The plain differences between Nevada and Florida procedural law in this context, as well as the clear concessions and proffers of counsel in this very case, demonstrate that Florida's sovereign interest in adjudicating this properly-pled FDUPTA claim should not be at risk of being undermined by transfer. At the October 25, 2024, hearing, the Court inquired into whether the FDUPTA claim would "actually go[] away" after the case is transferred to Nevada. Hearing Transcript (partial rough), p. 1, l. 5. In response, Defendant's counsel acknowledged that it had attempted to enforce the forum selection clause to strip out the unfair trade practices claim in the California case after it transferred to Nevada: "We said we didn't know if [the forum selection clause] was enforceable, but if it was valid and enforceable [as to the unfair trade claim], we'll try to enforce it, which we did[.]" *Id.*, p. 4 ll. 21–24. That poses enough of a risk to the sovereign interest of Florida such that the Court declines to transfer the FDUPTA claim.

Finally, transfer is discretionary under 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in the interest of justice, a district court *may* transfer any civil action to any other district or division where it may have been brought[.]" (emphasis added)). Looking at the statutory factors that inform the exercise of this Court's discretion, none of them tips toward transfer of the FDUPTA

claim. In fact, they tip against transfer. The record reflects Plaintiff will face substantial hardship if forced to litigate in Nevada; whereas, Defendant, at bottom, argues that it would be inconvenienced to litigate here. However, Defendant admittedly raked in millions of dollars in taxes on tax-exempt products sold to thousands of Floridians. If those millions were made in violation of Florida law as alleged, the interest of justice is certainly not served by transferring the FDUPTA class claims to Nevada—where they could be extinguished entirely by operation of Nevada law even if there is sufficient evidence to prove them.

### IV.    CONCLUSION

In view of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Transfer [**ECF No. 17**] and Motion to Dismiss [**ECF No. 18**] are **DENIED IN PART** and **GRANTED IN PART**.

    a. The Court retains jurisdiction over Plaintiff's FDUPTA claims (Count I).

    b. Plaintiff's claims for breach of contract (Count II) and unjust enrichment (Count III) are **TRANSFERRED** to the District of Nevada pursuant to 28 U.S.C. § 1404(a).

2. Plaintiff's Motion to Strike [**ECF No. 46**] is **DENIED AS MOOT**.

3. Defendant must file an Answer to the FDUPTA claim, and the parties must file a Joint Scheduling Report for this case **no later than December 2, 2024.**

**DONE AND ORDERED** in the Southern District of Florida this 18th day of November, 2024.



DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc:  counsel of record

# Exhibit D-2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISON**

Case No.: 0:24-cv-60489-LEIBOWITZ

RICKEY MARTIN, on behalf of
himself and others similarly situated,

        Plaintiff,

v.

LENS.COM, INC.,

        Defendant.

_____/

## SUPPLEMENTAL DECLARATION OF TIM JAECK

I, Timothy Jaeck, based upon my personal knowledge and to the best of my understanding, declare as follows:

1. I am over the age of 18 and a resident of Las Vegas, Nevada. I am familiar with the facts set forth herein and would testify consistent with the following if called upon to do so.

2. I am the Director of Finance for Speed Commerce, LLC ("Speed Commerce") and have served in this role for approximately 6 years as of the date of this declaration.

3. Speed Commerce is a distinct entity that has a contractual relationship with Lens.com, Inc. ("Lens.com") by which Speed Commerce provides various logistical and financial services for Lens.com.

4. I am not employed by Lens.com, but do have access to certain information related to the services provided by Speed Commerce for Lens.com and am familiar with Lens.com's business and the innerworkings of Lens.com's website.

5. Lens.com is headquartered, incorporated, and domiciled in Nevada.

6. Lens.com maintains business records in Nevada, and all Lens.com records are

1

available in Nevada, including records of customer purchases, the values of any Processing Fee charged, and communications regarding these Processing Fees. Lens.com makes its business decisions at its headquarters in Nevada. These decisions include decisions regarding the design of Lens.com's website and decisions concerning the Processing Fee.

7.  What Martin refers to as a "corporate office" in Missouri is a distribution center. This is where contact lenses are shipped from. Thus, the contact lenses are sent from "America's heartland."

8.  I understand there are five lawsuits pending against Lens.com that are all based on similar allegations of wrongful conduct related to the processing fee: 1) *Martin v. Lens.com*, the present case; 2) *Franks v. Lens.com, Inc.*, Case No. 2:24-cv-00724 in the District of Nevada; 3) *Nail v. Lens.com, Inc.*, Case No. 2:24-cv-01149 transferred to the District of Nevada; 4) *Fitzpatrick v. Lens.com, Inc.*, Case No. 1:24-cv-02700 in the Northern District of Illinois; and 5) *Gonneville v. Lens.com, Inc.*, Case No. 1:24-cv-11110 in the District of Massachusetts. Lens.com was served with a copy of Martin's complaint in Nevada.

9.  I understand that each of the lawsuits listed in ¶ 8 allege that Lens.com acted wrongfully by charging a Processing Fee to consumers when they purchase lenses from Lens.com's website. I further understand that plaintiffs in two of the five lawsuits, Franks and Gonneville, seek to represent a national class.

10. Lens.com's sole officer is Cary Samourkachian. He is the president and CEO of Lens.com. He is also a Nevada resident.

11. Keeping Martin's lawsuit in Florida will significantly burden Lens.com and me. Specifically, keeping Martin's lawsuit in Florida would require Mr. Samourkachian, the only officer of Lens.com to travel to Florida to give testimony that will already be given in Nevada. If the cases in Illinois and Massachusetts are also not transferred, the burden would be further compounded because he may have to give the same testimony that will already be given in

2

Nevada two additional times. Without transfer, there are four times in four different states that myself and Mr. Samourkachian would have to be deposed. The time that Mr. Samourkachian would have to spend giving duplicative testimony on the same issues will prevent Mr. Samourkachian from effectively running his business. The time that I would have to spend giving duplicative testimony would impair my ability to perform my duties for Speed Commerce.

12. Mr. Samourkachian and I are expected to provide relevant testimony in this matter. It is my understanding that Mr. Samourkachian and I will likely testify on multiple relevant issues, including:

- Why Lens.com charges a processing fee;
- The purpose of that fee;
- That prices on Lens.com's website are lower, even with the processing fee, than other sources;
- That most consumers have not complained about the processing fee;
- Lens.com's sales, including the value of the processing fee;
- Lens.com's business model;
- The design of Lens.com's website; and
- other relevant facts.

I declare under penalty of perjury under the laws of Florida and the United States that the foregoing is true and correct, and that this declaration was executed on the 27th day of August, 2024, in Las Vegas, Nevada.

By: _____

Tim Jaeck

3

# Exhibit E

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT DEPARTMENT
BUSINESS LITIGATION SESSION

_____

|  |  |
|---|---|
| ANGELA GONNEVILLE, individually and on behalf of all others similarly situated | ) ) ) ) |
| Plaintiff | ) ) |
| v. | ) ) |
| LENS.COM, INC. | ) ) |
| Defendant | ) ) ) |

CIVIL ACTION NO.

kg

_____

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, Angela Gonneville, individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages for unfair and deceptive sales practices committed by Defendant, Lens.com, Inc.

## <u>INTRODUCTION</u>

1.     This is a consumer class action case involving an undisclosed junk fee that Lens.com charges as part of online contact lens orders.  More particularly, Lens.com adds an undisclosed and non-itemized "processing charge" to contact lens orders after customers have already filled out the details of their contact lens orders.  Lens.com has received numerous complaints regarding this undisclosed charge.

2.     Plaintiff seeks to represent a class of consumers in Massachusetts who have paid an undisclosed processing or handling charge on their contact lens order.  Given the amount of the

fees at issue and given the number of potential consumers impacted, a class action is the most judicially efficient manner of adjudicating this dispute.

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff, Angela Gonneville ("Plaintiff" or "Ms. Gonneville"), is an individual who resides in Massachusetts.

4.      Defendant, Lens.com, Inc. ("Lens.com" or "Defendant"), is a Nevada corporation with its principal place of business in the State of Missouri.

5.      The Court has original jurisdiction over the civil claims alleged in Plaintiff's Complaint pursuant to M.G.L. ch. 212 § 4.

6.      This Court has personal jurisdiction over Lens.com pursuant to M.G.L. ch. 223 § 3 because Lens.com conducts significant business in Massachusetts, namely through the marketing, advertising, selling and delivery of contacts lens products in Massachusetts to consumers such as Plaintiff.

7.      Likewise, venue is proper here as the defendant markets, advertises, sells and delivers contacts lens products to Massachusetts consumers in this county.

## FACTUAL BACKGROUND

**The Business of Lens.com**

8.      Lens.com is an online seller of contact lenses and claims that it provides consumers "the best way to buy contact lenses - better than your eye doctor, better than big box, better than other websites." Lens.com further claims that it offers the lowest prices of any contact lens seller online or in-store and that most orders ship within 24 hours.

9.      Lens.com markets its contact lenses as having "Year Round *Unbeatable* Prices." On its website it states that it has delivered over 691 million contact lenses. It further touts that,

"With over 35 Million contact lenses in stock, we immediately fill your order with your exact prescription."

10.     In a FAQ (frequently asked question) on its website entitled, "How much does shipping cost?", Lens.com states: "At Lens.com we don't bury the cost of shipping in every box we sell. We are completely transparent and let you decide what's best for you. We offer you reliable shipping at extremely competitive prices/rates. You will be able to select the best method for your personal needs at checkout." It then includes a chart of shipping costs within the United States, Canada and Internationally.  Nowhere under its description of shipping costs is there mention of a "processing" or "handling" fee of any kind.  A search of the words "Processing Fee" on Lens.com's website yields no information.

**The Proliferation of Junk Fees in Online Consumer Transactions**

11.     Retailers, like Lens.com, are increasingly charging consumers "junk fees" in online transactions to increase profits.  "Junk Fees" are defined by the Federal Trade Commission as "unnecessary, unavoidable, or surprise charges that inflate costs while adding little to no value." The FTC notes that "[c]onsumers can get hit with junk fees at any stage of the purchase or payment process. Companies often harvest junk fees by imposing them on captive consumers or by deploying digital dark patterns and other tricks to hide or mask them." https://www.ftc.gov/news-events/news/press-releases/2022/10/federal-trade-commission-explores-rule-cracking-down-junk-fees.

12.     Common junk fees are convenience fees, processing fees, resort fees, service fees and overdraft fees.  The White House recently issued a junk fee guide for the states noting how junk fees have overrun the American economy and are "often not disclosed upfront and only revealed after a consumer has decided to buy something, obscure true prices and dilute the forces

3

of market competition that are the bedrock of the U.S. economy."

https://www.whitehouse.gov/wp-content/uploads/2023/03/WH-Junk-Fees-Guide-for-States.pdf

**Lens.com's Sales Practices and Junk Fees**

13.     Lens.com's marketing materials state that "we don't bury the cost of shipping in every box we sell.  We are completely transparent and let you decide what's best for you.  We offer you reliable shipping at extremely competitive prices/rates.  You will be able to select the best method for your personal needs at checkout."

14.     Despite these claims, Lens.com packs a junk fee into its transactions which it describes after the point of purchase as a "processing fee."  This processing fee is separate from its shipping fee, which in the Plaintiff's case was either free or $7.95.

15.     Lens.com fails to disclose or itemize its processing fee during online transactions and inflates the total transaction price by the amount of the hidden processing fee at the end of the transaction when a consumer's credit card is being processed.  These hidden fees add to the total product price but are not disclosed at any point in the cycle of the transaction, in marketing materials, frequently asked questions on Lens.com's website or in product pricing disclosures.

16.     In some transactions, Lens.com never discloses the existence or amount of its processing fee.  In other transactions the hidden fees are only disclosed on a packing slip provided to the consumer when the product is delivered. In those circumstances, the hidden fees are listed as "PROCESSING" or as "Shipping & Handling" fees.

17.     The amount of the processing fee charged by Lens.com varies greatly and from transaction to transaction. The Plaintiff's processing fees were $55.97, $22.57 and $5.21.

18.     Numerous online complaints made by Lens.com customers describe processing fees that are over $100.  The below listed consumer complaints made to Complaints Board, an

4

online consumer complaint center, describe Lens.com's surprise processing fee. Each consumer referenced below contacted the Defendant's customer service line to complain about the processing fee and, accordingly, these complaints constitute notice and knowledge to the Defendant of the unfair and deceptive nature of their processing and other fees. The online complaints state in relevant part:

**Processing Fees**
Contact lenses were ordered for my child over the phone in February of 2021. The bill received did not break out the $103 processing fee for an order of $107 in contacts. The processing fee did not include shipping fees. This was discovered when trying to tally the order for reimbursement by the child's father months later and the lens cost did not add up to the total. When contacting the company the only adjustment offered was a $7.95 shipping credit. The price of contacts was severely misrepresented due to the arbitrary and, per customer service, ever changing "processing fees". (Chobbs 1411 of US; August 27, 2021)

**Lens.com review: Astronomical processing fee for contact lens order.**
Customer since 2014... Last order placed 12/26/2020 and was charged processing fee of $110.38... I immediately contacted the company and was simply told "that was their processing fee"... I escalated the issue as I have never paid more than $35.96 for a processing fee (last order was 8/2020 and fee was $29.54)... Continued to reach out via email and was finally told on Jan 3rd that my complaint was escalated to leadership... I reached out again on Jan 11, 12 and now this morning and have never been contacted back... I am now in the process of disputing charge with the credit card company... I have included the processing fees paid so you can see for yourself the ridiculous amount charged this last order:

      4-2014 $18.16
      3-2015 $26.47
      8-2015 $26.11
      9-2016 $35.96
      9-2017 $25.51
      9-2018 $25.99
      12-2019 $27.51
      8-2020 $29.54
      12-2020 $110.38

I understand I owe for the contacts but I refuse to pay that amount for processing! (juhnklo of US; January 15, 2021)

**Extraordinarily high processing fee.**
On July 7, 2023, I submitted an order and paid $220 for 4 boxes of contacts. A bargain so I thought, because I would also get a $75 rebate. Again, so I thought. Imagine my surprise when I see I was charged $330 for my order due to a huge $120 processing fee. Apparently the 'submit order' button appears before the processing fee (which requires you to scroll down past the submit order so you don't see the additional fee.) It doesn't appear on the consumers invoice on their site, but somehow when you questions it, the Customer service people are able to produce an invoice showing the fee. They claim it is automatically added 'by the system' and they cannot refund any portion of it. The processing fee was more than 50% of my total purchase and in reading the complaints about them, they take so long to issue the $75 rebate that the expiration date is so close or past, rendering it useless as it is a visa gift card. These complaints date back to 2014 and nothing has changed. Below is the invoice AFTER the order was submitted. (K. Lennon, Rochdale, MA; July 18, 2023)

**Lens.com added 85% to my order in "tax & fees"**
⌨I intended to purchase 4 boxes of contact lenses at $31.74 per box. They advertised $9.24 per box if I ordered 8 boxes, which would have been $73.92, instead of $253. 92. When I clicked "checkout" the total was$485.79! They added $213.92 in "tax & fees", which is an additional 85%.

I clicked the "chat 24/7" line and the rep did everything possible to avoid explaining what "fees" were, since tax would be no more than $22 in any state. I had to ask SIX TIMES, but he finally was forced to admit that "fees" were: "This includes calling your doctor on your behalf, doctor's fees since we need to verify your prescription, and handling and processing your order. If the customer has a valid prescription, there is no need to call the doctor. Tax would have been $20 so the "rebate" which was applied to the order, tax and their undisclosed "fees" added 85% to the cost of the order. I told them that was fraud and they lost my business. (Gail Reznik of US; March 26, 2023)

**Hidden taxes and fees**
When I went to re-order my contacts at Lens.com I noticed advertised pricing and total cost didn't add up. I went to order my 8 boxes so I would get the $160 RB. Listed at $42.79 per box before RB (22.79 after RB) times the required 8 boxes = 342.32 ($182.32 after RB)plus $9.95 Shipping. This should make for a grand total of $352.27( before RB). At check out total came up as $566.19! Call Lens.com, spoke with a rep. I was told to go back to the shipping page, there they show a "Taxes & fees" of 213.92! Contacts are NOT taxable! They are a rip off company with miss leading and Illegal sales tactics. I've used them several times in the past and had not been charged these taxes & fees, I will no longer purchase from them and will

tell others of my bad experience. (Sharon McD of Levittown, US; March 1, 2023.

**Lens.com review: Deceptive fees and rebate hurdles**
Customer since 2014, but noticed a huge disparity in cost when initiating my most recent order. Without a rebate, they show $72.24 per 90-lens box of 1-day lenses. Buy 8 boxes and the price (after rebate) is shown as $35.99 and rebate as $290. Great. The next screen in the checkout asks you to confirm where you want the boxes sent with a 'continue' button below it. When you accidentally scroll below that, you see a blowout of the order, with a whopping $241.92 in taxes and fees that "are compensation for servicing your order". That's the only place they show the added taxes/fees. If you click 'continue' and approve where to send the boxes, you miss that, because the final checkout screen never shows that added charge in its summary of your order. ... This is deceptive. (eyecu of Seattle, US; January 12, 2023)

**Ridiculous fee added without my knowledge**
I just learned that they added a $50 fee for for processing on an $80 order. And the customer rep could not explain what the processing fee was for. What a ripoff! (thomassu of Centerville, US; December 5, 2022)

19. These consumer complaints describe in detail the repeated notice that Lens.com has received from consumers about its hidden processing fees and demonstrate its continued use of unfair and deceptive acts and practices to create revenue from junk fees.

**Plaintiff's Transactions**

20. Plaintiff's transactions with Lens.com highlight the deceptive nature of Lens.com's business practices. In August 2019, Plaintiff ordered three boxes of contact lenses for a total price of $77.29 with free shipping. The subtotal that was charged to Plaintiff, however, was $82.50, which included a $5.21 undisclosed processing charge. The "processing fee" was only disclosed on the packing form delivered with the contact lenses.

21. Likewise, in May 2020, Plaintiff ordered three boxes of contact lenses for a total price of $141.48 with free shipping. The subtotal that was charged to Plaintiff, however, was

$164.05, which thus included a $22.57 undisclosed processing charge. The packing form received when the contact lenses were delivered indicated a charge of $30.52 for "shipping & Handling."

22.     Similarly, in April 2021, Plaintiff ordered three boxes of contact lenses with a total price of $55.97 and free shipping. However, the subtotal charged to Plaintiff was $111.97 and thus included an undisclosed processing charge of $55.97. The one-page packing form received when the contact lenses were delivered did not itemize the transaction charges or disclose the amount of the processing fee.

23.     Plaintiff ultimately complained to Lens.com about the processing charges and was told that the processing fee used to be disclosed on the website but had been removed, there had been recent changes to the website but the fee was still not disclosed, the failure to disclose the processing fee has been reported to IT by several other agents and that Lens.com was trying to get that back up on the website.

## CLASS ACTION ALLEGATIONS

24.     Pursuant to Massachusetts Rule of Civil Procedure 23, Plaintiff brings this class action individually and on behalf of the following proposed class of persons, initially defined as:

All consumers who purchased contact lenses in Massachusetts and were charged a processing or handling fee with their contact lens order in the six years preceding the filing of this Complaint. (hereinafter the "Class").

The Class does not include Defendant; any affiliate, parent or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director or employee of Defendant; any successor or assign of Defendant; Plaintiff's counsel or anyone employed by Plaintiff's counsel in this action and their immediate families; any judge to whom this case is assigned and any member

of his/her immediate family and staff; governmental entities; or individuals who have personal injury claims as a result of conduct and/or defects alleged herein.

25. Plaintiff reserves the right to amend or supplement the Class descriptions with greater specificity or further division into subclasses or limitation to certain issues, after conducting discovery in this matter. Plaintiff also reserves the right to amend or supplement the proposed Class after conducting discovery in this matter.

### Rule 23 Class Certification Requirements

26. **Numerosity of the Class** – The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe that Lens.com processed tens or hundreds of thousands of contact lens orders and included an undisclosed processing fee with those orders. Adjudication of the claims in a class action context will provide substantial benefits to the parties and the Court.

27. **Commonality and Predominance** – Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members, as is required by Mass. R. Civ. P. 23(a)(2) and (b)(3). These common questions include, but are not limited to:

    a) whether Lens.com engaged in the conduct alleged herein;

    b) whether Defendant failed to adequately disclose a processing and/or handling fee prior to the completion of an online order for contact lenses;

    c) whether Defendant's undisclosed processing and/or handling fee inflated the product price;

    d) whether Defendant's processing and/or handling fees exceeded actual costs and constituted a hidden profit for Defendant;

    e) whether Plaintiff and Class Members suffered out-of-pocket losses as a result of Defendant's actions and/or inactions alleged herein, and if so, how much;

f) whether Plaintiff and Class Members will suffer out-of-pocket losses as a result of Defendant's alleged actions and/or inactions alleged herein, and if so, how much.

28. **Typicality** – The claims of the representative Plaintiff are typical of the claims of each member of the Class, thus satisfying Mass. R. Civ. P. 23(a)(3). Plaintiff, like all other members of the Class, have sustained damages arising from Lens.com's violations of the laws, as alleged herein. The representative Plaintiff and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Lens.com. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of all other members of the Class.

29. **Adequacy** – The representative Plaintiff will fairly and adequately represent and protect the interests of the Class Members and have retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation, thus satisfying Mass. R. Civ. P. 23(a)(4). There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class members.

30. **Declaratory or Injunctive Relief** – Lens.com has acted and refused to act on grounds generally applicable to Plaintiff and Members of the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate regarding the Class as a whole. Mass. R. Civ. P. 23(b)(2).

31. **Superiority** – This suit may be maintained as a class action under Mass. R. Civ. P. 23(b)(3), because a class action is superior to any other available means for the fair and efficient adjudication of this dispute and no unusual difficulties are likely to be encountered in its management of this class action. The damages suffered by individual class members are small in comparison to the burden and expense of individually litigating each claim and based on the

complex and extensive litigation needed to address Spirit's conduct. Further, it would be virtually impossible for the Class Members to individually redress effectively the wrongs done to them. Even if Class Members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

32.     **Ascertainability:** Upon information and belief, the precise number of Class Members may be ascertained from Lens.com's records. Plaintiff contemplates the eventual issuance of notice to the proposed Class members setting forth the nature of the instant action. Upon information and belief, Class members may be notified of this action by recognized, Court approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notices, in addition to Lens.com's own business records.

## COUNT I
## BREACH OF CONTRACT

33.     Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 23 as though fully stated herein.

34.     Plaintiff's and other Class members' purchase of contact lenses constituted a contract between them and Lens.com, namely through the terms and conditions on the Lens.com

site.  The terms and conditions do not mention a processing charge for online orders of contact lenses.

35.      Plaintiff and the Class Members performed all requirements under their agreements with Lens.com, namely the payment of the amount charged by Lens.com for the order.

36.      Lens.com breached its agreement with Plaintiff and the Class Members when it charged a hidden processing fee in connection with the contact lens orders.

37.      Plaintiff and members of the Class have suffered an injury through the payment of the processing fee.

38.      Plaintiff and Class members are therefore entitled to all incidental, consequential, and indirect damages resulting from Lens.com's breach of contract.  Lens.com's breach caused damages to Plaintiff and the Class Members.

39.      Plaintiff and the Class Members seek to recover all permitted damages and their attorneys' fees caused by Defendant's breach.

## COUNT II
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

40.      Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 23 as though fully stated herein.

41.      The Defendant had an obligation to exercise of duty of good faith and fair dealing when transacting business with Plaintiff and the Class.

42.      The Plaintiff and the Class made purchases at Lens.com's online website. Lens.com advertised, disclosed and charged a specific price for each contact lens purchase.  It claimed that it had the lowest contact lens prices.

43.     However, the Defendant, as matter a pattern and practice, assessed hidden junk fees to consumer's transaction which it labeled as processing and/or handling fees.  These fees were not described on the Defendant's website or as part of the sale.

44.     In addition, these junk fees varied from transaction to transaction.

45.     The junk fees were charged to Plaintiff's credit and debit cards, thereby driving up the actual costs of their contact lens purchases.

46.     Lens.com used these hidden fees, which do not purport to approximate actual expenses incurred, as a hidden profit center.  Not including these hidden fees in the product price allowed Lens.com to falsely claim that it had the lowest prices.

47.     Lens.com's pattern and practice of charging its consumers hidden junk fees in its transactions constituted a breach of the duty of good faith and fair dealing it owed to consumers as part of the transactions.

48.     As a direct and proximate result of the Defendant's acts and/or omissions, the Plaintiff and the Class suffered damages.

## COUNT III
## UNJUST ENRICHMENT

49.     Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 23 as though fully stated herein.

50.     Plaintiff and the Class Members conferred substantial benefits on Lens.com by purchasing contact lenses and by paying processing charges to Lens.com.

51.     Lens.com knowingly and willingly accepted and enjoyed those benefits. Lens.com's retention of these benefits is inequitable and would be against good conscience

52.     As a direct and proximate cause of Lens.com's unjust enrichment, Plaintiff and the Class Members are entitled to restitution, attorneys' fees, costs and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for a judgment against Defendant as follows:

a.  For an order certifying the Class, appointing Plaintiff as Representative of the Class, and appointing the law firm representing Plaintiff as counsel for the Class;

b. For compensatory damages and/or restitution or refund of all funds acquired by Lens.com from Plaintiff and the Class Members as a result of the Company's unlawful, unfair, deceptive and unconscionable practices described herein in an amount to be proven at trial;

c. For compensatory damages caused by Lens.com's breach of contract with Plaintiff and the Class Members to the extent permitted by law in an amount to be proven at trial;

d. Both pre-and post-judgment interest on any amounts awarded;

e. Payment of reasonable attorneys' fees and costs as allowed by law;

f. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Plaintiff requests a trial by jury on all claims.

On behalf of the Plaintiff and the
Putative Class,

*/s/ Carlin J. Phillips*

_____
Carlin Phillips, BBO# 561916
Andrew J. Garcia, BBO# 559084
PHILLIPS & GARCIA, P.C.
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 (fax)
cphillips@phillipsgarcia.com